**ELTRA CORPORATION, Appellant,**

v.

**Barbara A. RINGER, Appellee,**

**International Typographic Compositon Association and Advertising Typographers Association of America, Inc., Amici Curiae.**

**No. 77–1188.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 9, 1978.

Decided June 14, 1978.

E. Fulton Brylawski, Washington, D. C. (J. Michael Cleary, Robert H. Johnson, Senior Patent Atty., Eltra Corp., Toledo, Ohio, Henry W. Leeds, Mason, Fenwick & Lawrence, Washington, D. C., W. Gibson Harris, Annie Marie Whittemore, McGuire, Woods & Battle, Richmond, Va., on brief), for appellant.

Jon A. Baumgarten, Gen. Counsel, Library of Congress, New York City (Dorothy M. Schrader, Senior Atty., Library of Congress, James H. Simmonds, Arlington, Va., on brief), for appellee.

Hazel, Beckhorn & Hanes, Fairfax, Va. (Cowen, Liebowitz & Latman, New York City, on brief), for amici curiae International Typographic Composition Ass'n and Advertising Typographers Association of America, Inc.

Before WINTER, RUSSELL and WIDENER, Circuit Judges.

DONALD RUSSELL, Circuit Judge:

This appeal involves the application of the Copyright Act.[1] The appellant is a manufacturer of typesetting equipment. It

---

1. 17 U.S.C. § 1, et seq.

filed for registration with the Copyright Office a design of an alphabet and other typographical symbols placed on devices used in connection with its equipment. Such symbols are generally known as "typeface designs."[2] The design of the appellant had been prepared by a well-known typeface designer, to whom the appellant paid $11,000 for the design. It sought registration of this typeface as a "work of art" under the terms of what was then § 5(g) of the Copyright Act.[3] The Chief of the Examining Division of the Copyright Office refused to register the design, finding that it contained "no elements, either alone or in combination, which can be separately identified as a 'work of art.'" Such refusal represented the final action of the Copyright Office on the proposed registration. Following this rejection, the appellant instituted in the District Court its mandamus action to compel the appellee, the Register of Copyrights, to register its proposed copyright as a "work of art" under § 5(g).[4] Both parties made motions for summary judgment. The District Court denied the appellant's motion but granted the appellee's motion for summary judgment and dismissed the action. This appeal followed.

We affirm.

The appellant's right to registration necessarily turns on whether its design submitted for registration qualified as a "work of art" as that term was used in § 5(g). Congress offered no definition of "work of art" in the statute nor is there in the legislative history any clear declaration of Congressional intent in the use of the term. It did replace an earlier phrase, "work of fine arts," used in the predecessor provision of the Act. Obviously, though, the change in phraseology was "deliberately intended as a broader specification than 'works of fine arts' in the [earlier] statute."[5] Primarily, it seems to have been adopted in order to eliminate any "[v]erbal distinctions between purely aesthetic articles and useful works of art"[6] in the application of the term under the Act. And, in *Mazer v. Stein* (1954) 347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630, the Court gave effect to this obvious intention of the Congress in its new phrasing.

In *Mazer* "original works of sculpture in the form of human figures of traditional clay model technique" were submitted by a manufacturer for registration as "works of

2. A typeface was defined in the House Report of the 1976 revision of the Copyright Act, U.S. Code Cong. & Admin.News, 94th Congress, 2d Sess. (1976) at pp. 5659, 5668, as follows:

"\* \* \* A 'typeface' can be defined as a set of letters, numbers, or other symbolic characters, whose forms are related by repeating design elements consistently applied in a notational system and are intended to be embodied in articles, whose intrinsic utilitarian function is for use in composing text or other cognizable combinations of characters. \* \* \* "

3. § 5(g) was revised in the 1976 revision of the Copyright Act and now appears as subdivision (a)(5) of § 102, 17 U.S.C.:

"(5) pictorial, graphic, and sculptural works."

It would not appear that the change in language was meant to do more than clarify the meaning of the earlier phrase "work of art." *See* U.S.Code Cong. & Admin.News, 94th Cong., 2d Sess., p. 5667 (1976) and Nimmer, *The Subject Matter of Copyright under the Act of 1976*, 24 *U.C.L.A.L.Rev.* 977 at 998 (1977).

For a general review of the 1976 revisions, *see*, Gorman *An Overview of the Copyright Act of 1976*, 126 *U.Pa.L.Rev.* 856 (1978) and *Sym-*

*posium: The Copyright Act of 1976*, 24 *U.C.L. A.L.Rev.* 951 (1977).

4. Under the 1909 Act, mandamus was the proper remedy for a review of the Register's exercise of discretion in denying registration. *Vacheron & Constantin-Le Coultre W. v. Benrus W. Co.* (2d Cir. 1958) 260 F.2d 637, 640. The 1976 Amendments eliminate any need to secure registration as a prerequisite to an infringement suit and authorize suit for infringement, despite the Register's denial, so long as the Register is notified of the litigation, § 411(a), 17 U.S.C. *See*, Levine & Squire, *Notice, Deposit and Registration: The Importance of Being Formal*, 24 *U.S.L.A.L.Rev.* 1232, at 1261 (1977).

5. Arguments before the Committees on Patents of the Senate and House of Representatives conjointly on S. 6330 and H.R. 19853, To Amend and Consolidate the Acts Respecting Copyright, 59th Cong., 1st Sess., June 6–9, 1906, p. 11, quoted in *Mazer v. Stein* (1954) 347 U.S. 201 at 213, 74 S.Ct. 460, 98 L.Ed. 630.

6. 347 U.S. at 211, 74 S.Ct. at 467.

art" under § 5(g) and a certificate of registration was duly issued for such statuettes. The manufacturer then used the statuettes as bases "for table lamps, with electric wiring, sockets and lamp shades attached." [7] A rival manufacturer, however, "copied the statuettes, embodied them in lamps and sold them." The first manufacturer sued claiming "infringement of six copyrights for small three-dimensional statuettes of male and female dancing figures made of semi-vitreous china." In affirming a finding of infringement of the copyright covering the statuettes, the Supreme Court relied on "a contemporaneous and long-continued construction of the statutes by the agency charged to administer them that would allow the registration of such a statuette as is in question here," and upheld the statuettes as "works of art" even though they "might also serve a useful purpose" in the manufacture of lamps.[8]

■ The important fact, which must not be overlooked in analyzing *Mazer*, is that the Supreme Court in that case was dealing with a statuette, which though incorporated in a commercial article, was capable of existing independently and had itself been registered as a *separate* "work of art" under § 5(g). And it was that type of "applied art" which the court found copyrightable under *Mazer*. And the Copyright Office proceeded to amend its Regulations defining "works of art" under § 5(g) to conform, (§ 202.10(c), 37 C.F.R.):

"(c) If the sole intrinsic function of an article is its utility, the fact that the article is unique and attractively shaped will not qualify it as a work of art. However, if the shape of a utilitarian article incorporates features, such as artistic sculpture, carving, or pictorial representation, which can be identified separately and are capable of existing independently as a work of art, such features will be eligible for registration."

This amended Regulation spelt out a plain distinction and sought to draw a precise line between copyrightable works of applied art and uncopyrighted works of industrial design, as declared in *Mazer*. And the distinction as expressed in the Regulation, clearly accorded with Congressional intent and understanding, which, after all, is the controlling factor in statutory construction, as demonstrated by the long acquiescence of Congress in the Regulation.[9] That this is so is clear from the exhaustive House Report on the 1976 revision of the Copyright Act, wherein the language of Regulation 202.10(c) is quoted and declared to be the proper construction of the phrase "works of art" [10] as used in § 5(g). Thus, Regulation 202.10(c) represents the consistent construction of § 5(g) by the "agency charged to administer" the Copyright law

---

7. *See, Stein v. Mazer* (4th Cir. 1953) 204 F.2d 472, 473, *aff'd Mazer v. Stein* (1954) 347 U.S. 201, 202–203, 74 S.Ct. 460, 98 L.Ed. 630.

8. 347 U.S. at 212 and 213, 74 S.Ct. at 467.

9. 204 F.2d at 477.

10. U.S.Code Cong. & Admin.News, *supra*, at 5668:

"In adopting this amendatory language, the Committee is seeking to draw as clear a line as possible between copyrightable works of applied art and uncopyrighted works of industrial design. A two-dimensional painting, drawing, or graphic work is still capable of being identified as such when it is printed on or applied to utilitarian articles such as textile fabrics, wallpaper, containers, and the like. The same is true when a statue or carving is used to embellish an industrial product or, as in the *Mazer* case, is incorporated into a product without losing its ability to exist independently as a work of art. On the other hand, although the shape of an industrial product may be aesthetically satisfying and valuable, the Committee's intention is not to offer it copyright protection under the bill. Unless the shape of an automobile, airplane, ladies' dress, food processor, television set, or any other industrial product contains some element that, physically or conceptually, can be identified as separable from the utilitarian aspects of that article, the design would not be copyrighted under the bill. * * * *"

since the early 1950s, accords with the decision in *Mazer,* and conforms with the Congressional intent itself in the definition of the term "works of art" in the Act, as shown by Congress' long acquiescence in the construction and, more importantly, by its specific approval as expressed in the House Report on the 1976 revision.

█ Under Regulation 202.10(c) it is patent that typeface is an industrial design in which the design cannot exist independently and separately as a work of art. Because of this, typeface has never been considered entitled to copyright under the provisions of § 5(g).[11] And the appellant has recognized this because over the years it, along with the others in the trade, has sought repeatedly to induce Congress to amend the law in order to provide copyright protection to typeface. Just as consistently, Congress has refused to grant the protection. The latest refusal was in connection with the 1976 revision. The right to registration is purely statutory and depends on legislative authorization. What Congress has refused to authorize for registration, Courts cannot authorize or require.

█ The appellant, however, urges that the District Court found that the typeface in this case was a "work of art" and that the definition of that term incorporated in Regulation 202.10(c) was "erroneous." It argues that, having made those findings, the District Court erred in not granting it relief. Simply because some of the District Court's reasoning was erroneous as a matter of law does not require reversal of the decision itself if the Court has reached the correct result.[12] In this case the District Court did reach the correct result, even though it erred in finding the typeface a "work of art" and in declaring Regulation 202.10(c) of the Copyright Act invalid.

█ While the principal argument of the appellant is directed to the claim that its work was entitled to registration by the Copyright Office as a "work of art" under § 5(g), it raises the point that the Register of Copyrights is a legislative office and as such may not exercise any executive powers or authority, in particular any power to issue rules and regulations, though there is specific legislative authorization for such exercise of power. Pursuing this line of reasoning, it argues that the Register can legally exercise no power to deny registration to any "writing" or design submitted; that his power is very strictly limited to the receipt, deposit and issuance of a registration certificate. It must be conceded that

11. The latest declaration by Congress appears in the House Report in the 1976 revisions, *supra,* at 5668–9:

"The Committee does not regard the design of typeface, as thus defined, to be a copyrightable 'pictorial, graphic or sculptural work' within the meaning of this bill and the application of the dividing line in section 101."

The appellant has pointed to a number of instances in which it claims the Copyright Office has accepted for registration typefaces. It is plain, though, that registration was allowed by the Copyright Office in the instances cited by the appellant because the work therein involved met the statutory classification listed in the Act other than that set forth in § 5(g) and those works were submitted for registration under sections of the Act other than § 5(g).

That the Copyright Office has consistently denied registration to typeface is shown by the appellant's own testimony in Congressional hearings in 1975. Its spokesman at those hearings testified that the appellant had never "successfully obtained [copyright] protection under any present law for typeface." Yet one of the instances cited in this case by the appellant as an allowance for copyright registration of a typeface is a copyright granted the appellant! When the appellant cited such instance to the Court, it must have known that the registration was not of typeface as a "work of art" under § 5(g) but was under another subsection of § 5.

12. *Helvering v. Gowran* (1937) 302 U.S. 238, 245, 58 S.Ct. 154, 82 L.Ed. 224; *Lusk v. Eastern Products Corporation* (4th Cir. 1970) 427 F.2d 705, 708; *Tanzer v. Huffines* (3d Cir. 1969) 408 F.2d 42, 45, n. 7; *Lum Wan v. Esperdy* (2d Cir. 1963) 321 F.2d 123, 125–6.

this contention, which counsel for the appellant first adumbrated in 44 *George Washington Law Review* 1, represents in effect a belated challenge to the 1909 revision of the Copyright Act and an attempt to confine the Register to the narrow range of duties exercised by him prior to the 1909 Act. In the roughly three-quarters of a century that the 1909 revision has been in effect, however, its constitutional validity has been generally assumed, including the power of the Register to issue rules and regulations. Indeed, the leading case of *Mazer v. Stein, supra,* proceeded on the assumption that the Register had such power and the decision in that case relied in its result to a substantial extent on the application of a rule issued by the Register under the ·authorization given him by the 1909 Act. As a matter of fact, counsel for the appellant, in his article in 44 *George Washington Law Review* admits that on three occasions the Supreme Court has given weight to rulings and interpretations of the 1909 Act by the Register.[13] In the light of this record, it seems incredible that, if there were a constitutional infirmity in the 1909 Act, it would have so long escaped notice by either the Supreme Court or the bar or that the Supreme Court would have given. implicit authorization in the three decisions set forth in Note 13 for the exercise by the Register of the power to issue rules and regulations, as provided in the Act. Nor is it easy to see how a ruling that the Act of 1909, in delineating the powers of the Register, was unconstitutional can enhance the appellant's right of action. After all, whether or not the Register's duties áre limited, as the appellant argues, to the mere receipt and indexing of copyright applications, he would perform substantially the same duties as a clerk of court, who was declared in *Buckley*[14] to be an "interior officer[s] of the United States within the meaning of the Appointments Clause,"[15] and he and his actions would be open to the same charge of unconstitutionality as if he were exercising the additional power to deny registration given him under the 1909 Act. Accordingly the Register, under the appellant's argument, would be performing an unconstitutional act, whether he undertook merely to receive, index and issue perfunctorily a certificate of registration in much the same way as a clerk of court would or undertook to deny registration. Since *Marbury v. Madison* (1803) 1 Cranch 137, 2 L.Ed. 60, it has been hornbook law that a public officer cannot be mandamused to perform an unconstitutional act. It would follow that, even if we accepted the appellant's argument, the petition of the appellant for a writ of mandamus would have to be dismissed. We, however, do not find the appellant's constitutional argument persuasive.

The appellant relies for its claim of unconstitutionality on the recent case of *Buckley v. Valeo, supra,* which found the initial act creating the Federal Election Commission[16] violative of the constitutional requirement of the separation of legislative and executive powers.[17] The flaw in that Act, as urged by the plaintiff, lay in the fact that a majority of the Commission was appointed by the Congress.[18] This is evident from the issue in controversy, as stated by the plaintiff (pp. 118–119, 96 S.Ct. p. 682):

**13.** *See,* 44 *Geo.Wash.L.Rev.* at 23, n. 114:
"Three Supreme Court opinions have apparently acknowledged that interpretations by the Copyright Office, particularly if long-continued, are entitled to weight in a judicial proceeding. See *Goldstein v. California,* 412 U.S. 546, 567–69 (1973); *DeSylva v. Ballentine,* 351 U.S. 570, 577–78 (1956); *Mazer v. Stein,* 347 U.S. 201, 211–14 (1954)."

**14.** *Buckley v. Valeo* (1976) 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed. 659.

**15.** 424 U.S. at 126, 96 S.Ct. at 685.

**16.** 2 U.S.C., § 431, *et seq.*

**17.** Article II, § 2, cl. 2 of the Constitution.

**18.** *See* 424 U.S. at 124, 96 S.Ct. at 684:
"More closely in point to the facts of the present case in this Court's decision in *Springer v. Philippine Islands,* 277 U.S. 189, [48 S.Ct. 480, 72 L.Ed. 845] (1928), where the Court held that the legislature of the Philippine Islands could not provide for legislative appointment to executive agencies."

" \* \* \* If the Legislature wished the Commission to exercise all of the conferred powers, then its members are in fact 'Officers of the United States' and must be appointed under the Appointments Clause. But if Congress insists upon retaining the power to appoint, then the members of the Commission may not discharge those many functions of the Commission which can be performed only by 'Officers of the United States,' as that term must be construed within the doctrine of separation of powers." [19]

In short, the decision in *Buckley*, as did the earlier case of *Springer v. Philippine Islands* (1928) 277 U.S. 189, 48 S.Ct. 480, 72 L.Ed. 845, turned on the constitutional inability of the Congress to make appointments to executive agencies.[20] That this was what infected certain of the operations of the Commission with invalidity the Court made plain in its summary of its holding:

"We think that the term 'Officers of the United States' as used in Art. II, defined to include 'all persons who can be said to hold an office under the government' in *United States v. Germaine, supra*, [99 U.S. 508, 25 L.Ed. 482 (1979)] is a term intended to have substantive meaning. We think its fair import is that any appointee exercising significant authority pursuant to the laws of the United States is an 'officer of the United States,' and must, therefore, be appointed in the manner prescribed by § 2, cl. 2, of that Article."

■ Unlike the Federal Election Commission, however, the Office of the Register of Copyrights is not open to any charge that it is violative of the Appointments Clause. The Register is appointed by the Librarian of Congress, who in turn is appointed by the President with the advice and consent of the Senate. By the nature of his appointment the Librarian is an "Officer of the United States, with the usual power of such officer to appoint 'such inferior Officers [i. e., the Register], as [he] think[s] proper." This case is accordingly different from either *Buckley* or *Springer*, and the appointment of the Register accords fully with the requirements of the Appointments Clause in connection with the appointment of executive officers clothed with the power to issue regulations. This the appellant apparently recognizes for it seeks in its brief to develop another theory for a finding of unconstitutional exercise of power by the Register in its denial of registration to its design. This argument is also grounded on some language in *Buckley*.

In *Buckley*, the Court did not declare all the functions of the Commission invalid under the separation clause; it found that such of the Commission's powers as were "essentially of an investigative and informative nature, falling in the same general category as those powers which Congress might delegate to one of its own committees" [21] or, as Mr. Justice White put it, such of the powers as represented the gathering and making available "for public inspection massive amounts of information relevant to the legislative process," [22] might be regarded as legislative in character and, therefore, valid exercises of the legislative, as distinguished from the executive, power by the Commission. The appellant argues that the Librarian of Congress, to whom the Register of Copyrights owes his appointment, does gather information for the Congress "relevant to the legislative process" through its division of Congressional Re-

---

**19.** The Appointments Clause (Art. II, § 2, cl. 2) is in pertinent part:

"[The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of the Departments."

**20.** Mr. Justice White, in his concurring opinion, stated the issue posed by the plaintiff thus (p. 269, 96 S.Ct. p. 750):

" \* \* \* The challenge to the FEC, therefore, is that its members are officers of the United States the mode of whose appointment was required to, but did not, conform to the Appointments Clause."

**21.** 424 U.S. at 137, 96 S.Ct. at 691.

**22.** 424 U.S. at 281, 96 S.Ct. at 756.

search Service. But this no more makes the *entire* operations of the Librarian of Congress legislative than did the legislative aspect of the Federal Election Commission's information-gathering function render *all* the operations of the Commission legislative. Indeed, if this argument were adopted as presenting the proper point of difference under the separation clause, it could be fairly contended that the Librarian of Congress was actually a judicial officer, since he is commanded by statute to operate a law library, governed by rules and regulations issued by the Supreme Court, and intended to service that Court.[23] In *Buckley*, the Court chose rather to consider each function of the Commission separately and to determine the character of each, whether legislative or executive, resolving the validity of the function on the basis of such determination. Adopting that same procedure in reviewing the several functions of the Librarian of Congress, it would appear indisputable that the operations of the Office of Copyright are executive.

The registration of copyrights cannot be likened to the gathering of information "relevant to the legislative process" nor does the Register perform a function "which Congress might delegate to one of its own committee." The operations of the Office of the Register are administrative and the Register must accordingly owe his appointment, as he does, to appointment by one who is in turn appointed by the President in accordance with the Appointments Clause. It is irrelevant that the Office of the Librarian of Congress is codified under the legislative branch or that it receives its appropriation as a part of the legislative appropriation. The Librarian performs certain functions which may be regarded as legislative (*i. e.*, Congressional Research Service) and other functions (such as the Copyright Office) which are executive or administrative. Because of its hybrid char-

acter, it could have been grouped code-wise under either the legislative or executive department. But such code-grouping cannot determine whether a given function is executive or legislative. After all, the Federal Election Campaign Act of 1971, under which the Federal Election Commission reviewed in *Buckley* was appointed, is codified under the legislative heading and its appropriations were made under that heading.[24] Neither the Supreme Court nor the parties in *Buckley* regarded that fact as determinative of the character of the Commission, whether legislative or executive. It is no more permissible to argue, as the appellant did in the article in the *George Washington Law Review*,[25] that the mere codification of the Library of Congress and the Copyright Office under the legislative branch placed the Copyright Office "within the constitutional confines of a legislative agency" than it would be to contend that the Federal Election Commission, despite the 1974 amendment of the Act with reference to the appointment of its members, is a legislative agency unconstitutionally exercising executive administrative authority.

The Supreme Court has properly assumed over the decades since 1909 that the Copyright Office is an executive office, operating under the direction of an Officer of the United States and as such is operating in conformity with the Appointments Clause. The challenge of the appellant to the constitutionality of the 1909 Act and to the Register's power thereunder, would, if properly before us, be without merit.

The order of the District Court dismissing this action is accordingly

*AFFIRMED.*

---

23. 2 U.S.C. § 137.

24. 2 U.S.C., § 431, *et seq.*

25. 44 *Geo.Wash.L.Rev.* at 12:
"  *  *  * Under this rule, it seems axiomatic that the Copyright Office cannot exercise executive or judicial functions as long as it

remains within the legislative branch. If it is to remain within the constitutional confines of a legislative agency, the law requires that it exercise only ministerial powers without any degree of discretion or power of statutory interpretation."