McKEOWN, Circuit Judge,
concurring:
I writ'? separately to express my concern with ¡.he majority’s definition of applied which centers on whether an object is-;, o." retains a utilitarian function. Maj. Op. 693-94. This focus runs the risk of unduly narrowing the protections of artists undo? the Visual Artist Right’s Act of 1990, 17 U.S.C. § 106A (“VARA”), and not *598 focusing on the work as a whole. Although the majority’s formulation may protect the clearest cases — those works that are “purely aesthetic” or “so transformed through the addition of artistic elements that [their] utilitarian functions cease,” Maj. Op. 594, — it leaves other cases — such as works of art that incorporate utilitarian elements, or that could be put to practical purposes — out in the cold. To better effectuate the purpose of VARA, we need a more nuanced definition of “applied art” that balances between the risk of unduly restricting VARA’s reach and the risks of turning judges into art critics or consigning to litigation every work of art that includes some utilitarian function. In determining whether a work is “applied art,” the right question to ask is whether the primary purpose of the work as a whole is to serve a practical, useful function, and whether the aesthetic elements are subservient to that utilitarian purpose. Because the bus/Spanish galleon La Contessa is applied art under either standard, I concur in the judgment as well as parts I, II, IV, and V of the panel opinion.
VARA enshrined the concept of droit moral, or “moral rights,” in American law to a limited extent. Cheryl Swack, Safeguarding Artistic Creation and the Cultural Heritage: A Comparison of Droit Moral Between France and the United States, 22 Colmm-VLA J.L. & Arts 361, 363 (1998). Long recognized in Europe, moral rights “afford protection for the author’s personal, non-economic interests in receiving attribution for her work, and in preserving the work in the form in which it was created, even after its sale or licensing.” Jane C. Ginsburg, Copyright in the 101st Congress: Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection Act of 1990, 14 Colum.-VLA J.L. & Arts 477, 478 (1990).
VARA protects the moral rights of attribution and integrity, but only for a narrow subset of the works of visual art already protected under the Copyright Act. 3 Nim-mer on Copyright § 8D.06[A][2]. Thus, the creator of a qualifying “painting, drawing, print, or sculpture,” or “still photographic image produced for exhibition purposes only,” 17 U.S.C. § 101, may “prevent any intentional distortion, mutilation, or other modification of [the] work which would be prejudicial to his or her honor” and to “claim authorship” of the work. Id. § 106A(a). Coverage is limited to these listed categories of works of visual art. The statute also prohibits the destruction of work of “recognized stature.” Id. § 106A(a)(3)(B). As a result, acts of so-called “art murder” like the removal of Diego Rivera’s mural from Rockefeller Center, now have limits.[1] Thus, when Kent Twitchell’s mural depicting artist Ed Ru-cha was painted over, Twitchell sued under VARA; he ultimately settled for $ 1.1 million.[2]
The protections provided by VARA “are analogous to those protected by Article 6bis of the Berne Convention.” H.R. Rep. *599 No. 101-514, at 5 (1990).[3] Affording artists these rights — which are otherwise largely not recognized in our intellectual property system — helps foster a' “climate of artistic worth and honor that encourages the author in the arduous act of creation.” Id. (internal quotations omitted); see also Kelley v. Chicago Park Dist., 635 F.3d 290, 296-98 (7th Cir. 2011) (detailing the history of VARA).
Although VARA amended the Copyright Act, its unique protections do not extend to every copyrightable work. Rather, the statute may be invoked only if the painting, drawing, print, sculpture, or “still photographic image produced for exhibition purposes only” is part of a “limited edition of 200 copies or fewer” that have been “signed and consecutively numbered by the author.” 17 U.S.C. § 101. Significantly, a work does not fall within VARA’s protection if, among other exclusions, it is mass-produced, intended for use in advertising, or is “applied art.” Id.
This case hinges on that final exception — applied art. The parties agree that La Contessa, a Spanish galleon built on the chassis of a school bus by Cheffins and Jones, was a sculpture. The parties also do not contest that La Contessa was a work of recognized stature. Thus VARA would prohibit the destruction of La Contessa unless it was a work of applied art.
The majority focuses the inquiry “on whether the object in question originally was — and continues to be — utilitarian in nature.” Maj. Op. 593. Thus, the majority holds “that an object constitutes a piece of ‘applied art’ — as opposed to a ‘work of visual art’ — where the object initially served a utilitarian function and the object continues to serve such a utilitarian function after the artist made embellishments or alterations to it.” Maj. Op. 594. This definition pays insufficient heed to the character of the work as a whole and fails to clarify when the product of artistic creation has crossed the threshold of functionality that transforms it from visual to applied art.
The central focus of our inquiry should be on whether a work is primarily directed to a utilitarian purpose. The majority’s bare statement provides scant guidance. At what point does the transformation from utilitarian object to work of art occur? Is any residual utilitarian function sufficient to consign a work to the “applied art” label, or must the utilitarian function be significant? Does it matter whether an object within a work retains a possible, but unused or impractical, utilitarian function versus whether it continues to be used for its original purpose? What is the magic dividing line that informs our legal determination? These questions highlight the need for a more textured and flexible definition of applied art.
Defining the term “applied art” is no easy task. To be sure, judicial attempts to categorize artistic creations are fraught with difficulties. As Justice Holmes observed long ago, judges make terrible art critics: “It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of pictorial illustrations.” Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251, 23 S.Ct. 298, 47 L.Ed. 460 (1903). There is some irony in the fact that VARA *600 was enacted as part of the Judicial Improvements Act of 1990, Pub. L. No. 101-650, which created eighty-five new federal district and appellate judgeships. Thankfully, apart from occasional fair use cases under the Copyright Act, these judges have been able to devote themselves to tasks other than critiquing paintings and sculptures. Although VARA does not ask us to assess the beauty or value of art, attempting to discern whether a unique creation is visual or utilitarian art poses similar challenges.
The difficulty of our job is compounded because VARA provides no definition of applied art. Leaders of the art community warned Congress that VARA “does not offer firm definitions” of applied and visual art, leaving “open for conjecture the kinds of art and artists eligible for protection.” Hearing on H.R. 3221, Visual Artists Rights Act of 1987, Before the Subcomm. on Courts, Civil Liberties and the Admin, of Justice of the H. Comm, on the Judiciary, 100th Cong. 136 (1988) (testimony of the Association of Art Museum Directors, American Arts Alliance, and American Association of Museums). Congress was unmoved: the House Report accompanying the bill unhelpfully states that the definition of applied art is “self-explanatory” and instructs courts construing the statute to use “common sense” as well as the “generally accepted standards of the artistic community.” H.R. Rep. No. 101-514, at 11, 13.
Although many court decisions have addressed applied art, these cases provide little guidance on how to distinguish applied from visual art. The issue in nearly all applied art cases is whether the work was copyrightable applied art or instead a noncopyrightable work of “industrial design.” See, e.g., Gay Toys, Inc. v. Buddy L Corp., 703 F.2d 970, 972 (6th Cir. 1983) (“Congress intended to distinguish between ‘copyrightable works of applied art and uncopyrighted works of industrial design.’ ” (quoting H.R. Rep. No. 1476, 94th Cong., 2d Sess. 54)); Norris Indus., Inc. v. Int’l Tel. & Tel. Corp., 696 F.2d 918, 920 (11th Cir. 1983) (“[There is a] distinction between works of applied art eligible for copyright protection and industrial designs ineligible for protection.”); Eltra Corp. v. Ringer, 579 F.2d 294, 297 (4th Cir. 1978) (noting the “precise line between copyrightable works of applied art and uncopy-righted works of industrial design”).
The analysis in these cases is driven by the principle that works may unquestionably be applied art, such as a detailed carving on the back of a chair — an obviously utilitarian object — but may also enjoy certain copyright protection.[4] Whether such a work falls under VARA’s protections is a different question. Thus, while these opinions have coalesced around a definition of applied art for the purpose of copyright protection as “pictorial, graphic, and sculptural works that are intended to be or have been embodied in useful articles,” 8-4A Nimmer on Copyright § 102, they do not provide an answer under VARA because VARA protects a new and different “genus” of “ ‘works of visual art,’ ” 3 Nimmer on Copyright § 8D.06[A][2].
VARA’s protections cannot be limited only to works entirely devoid of any utilitarian purpose. As Judge Gesell once noted: “Art through the ages has often served a utilitarian purpose[ ].” Esquire, Inc. v. Ringer, 414 F.Supp. 939, 941 (D.D.C. 1976), rev’d 591 F.2d 796 (D.C. Cir. 1978). *601 Many outstanding sculptures, including the Caryatids of the Acropolis and the monumental carvings of Ramses at the temple of Karnak are in fact columns that provided buildings with structural integrity. Medieval tapestries not only represented a form of fíne art, but also “ke[pt] castles and cathedrals free from draft.” William S. Lieberman, Modem French Tapestries, 6 Metropolitan Museum of Art Bulletin 142, 142 (1948). Of course, the famous Bayeux tapestries, which depict events leading to the Battle of Hastings, retain their utilitarian function to some extent: they could still be used to keep a drafty castle warm. Likewise, Tracy Emin’s My Bed, displayed at the Tate Britain, incorporates Emin’s real bed as a “monument to the heartache of a relationship breakdown.”[5] The bed arguably retains its original utilitarian function — it remains a bed, and could still be slept in — but it is no longer meant or used for this utilitarian purpose. Rather, like the Bayeux tapestries, My Bed is now appreciated and viewed as a work of creative expression and, when viewed as a whole, the utilitarian object has become part of a visual art piece.
The modern era abounds with examples of fine art that serve some utility. Perhaps the most famous sculpture of the modern era — Rodin’s The Thinker — was conceived when the artist was designing a set of monumental doors titled The Gates of Hell.[6] Doors, of course, are utilitarian objects that facilitate the movement of people into and out of buildings. Likewise, a young Pablo Picasso painted a massive background piece for the ballet Le Tricorne. Although that painting surely served some utilitarian purpose as a stage curtain, following that debut, it has been displayed as a painting for half a century. The painting was the focus of intense debate when it was removed last year from the Four Seasons restaurant in New York’s Seagram Building, where it had hung since 1959.[7] Some sculptures designed by Dale Chihuly are fantastically artistic and original and yet could also serve a utilitarian purpose of diffusing fresh water or serving as a room divider. The artistic and utilitarian aspects are entwined in some of Chihuly’s pieces.[8]
It is easy to imagine a sculpture composed of an array of utilitarian objects. VARA’s legislative history confirms this situation: Congress emphasized that because “[a]rtists may work in a variety of media, and use any number of materials in creating their works.... whether a particular work falls within the definition should not depend on the medium or materials used.” H.R. Rep. No. 101-514, at 11. Indeed, a Florida plumber/artist who created a sculpture with auto parts, plumbing fixtures and scrap wiring, found himself in the middle of VARA litigation when the “junk” was removed.[9] Automatically rele *602 gating these pieces — which are unquestionably works of visual art — -beyond the scope of VARA simply because they may serve some practical function would undermine the purpose of the law.
The majority alludes to the fact that a work would not necessarily fall outside VARA’s scope simply because it could possibly serve some practical purpose, concluding that La Contessa must be “applied art” because “it continued to serve a significant utilitarian function upon its completion.” Maj. Op. 595. But how significant the utilitarian function must be — either when a work is initially created, or after it undergoes artistic modifications — cannot be deduced from the majority’s test for “applied art.” The analysis must be more nuanced, and, as a matter of procedure, in some cases, these issues will raise questions of fact that preclude summary judgment.
Art dictionaries and reference materials provide useful guidance on this score. In seeking to distinguish applied art from “fine art,” The Concise Oxford Dictionary of Art Terms states that applied art is “Art that is created for useful objects and remains subservient to the functions of those objects.” The Concise Oxford Dictionary of Art Terms 13 (Michael Clarke and Deborah Clarke eds., 2d ed. 2010) (emphasis added). As examples, it fists “ceramics, furniture, glass, leather, metalwork, textiles, arms and armour, clocks, and jewelry.” Id. Likewise, The Thames & Hudson Dictionary of Art Terms confirms that applied art is “Art which is essentially functional, but which is also designed to be aesthetically pleasing.” The Thames & Hudson Dictionary of Art Terms 17 (Edward Lucie-Smith ed., 2d ed. 2004) (emphasis added). This dictionary provides a similar fist of applied art items: “furniture, metalwork, clocks, textiles, [and] typography.” Id. The definition of applied art in materials published by the World Intellectual Property Organization (“WIPO”) — the body tasked with administering the Berne Convention — is also helpful. WIPO has defined applied art as “coverpng] the artistic contributions of the makers of knickknacks, jewellery, gold and silverware, furniture, wallpaper, ornaments, clothing, etc.” WIPO, Guide tó the Berne Convention for the Protection of Literary and Artistic Works 16-17 (1978).[10]
These definitions illustrate that applied art does not encompass every work that has any conceivable utilitarian purpose, nor one that incorporates functional objects or pieces. Rather, the definitions employed by art dictionaries and the objects they fist reflect that the key question is whether the primary purpose or essence of the work is utilitarian or functional.
To effect the purpose of VARA and provide guidance for the art community, I believe courts should evaluate the work as a whole, asking whether its primary purpose is to serve a useful function and whether the artistic creation is subservient to that purpose. If the primary purpose is for the work to be viewed and perceived as art, then any incidental utilitarian function will not push it outside the scope of VARA. If a work’s primary purpose is functional, however, no amount of aesthetic appeal will transfer it into visual art subject to VARA’s protections. Determining a work’s primary purpose need not constitute a ju *603 dicial inquiry into the nature of art. Rather, as in other legal contexts, courts should ask whether “a reasonable observer” would “consider [the work] designed to a practical degree” for a utilitarian or artistic purpose. See Lozman v. City of Riviera Beach, — U.S.-, 133 S.Ct. 735, 741, 184 L.Ed.2d 604 (2013) (articulating a “primary purpose” test for determining whether an object is a “vessel”).
In this case, applying the analysis I outline yields the same result as the majority: La Contessa was applied art. The school bus-turned-galleon was designed for, and employed as, a performance venue, restaurant, and means of transportation around the Burning Man festival. Poets, acrobats, and bands performed on its decks. It drove revelers from party to party within Nevada’s Black Rock desert. On various occasions, the galleon was driven at high speeds, prompting festival organizers to send Cheffins and Jones a letter condemning its “unsafe driving practices.” When La Contessa was not serving this purpose, it was dragged to a field, covered with a tarp, and left to sit idle for months at a time. Taken as a whole, this is powerful evidence that the primary purpose of La Contessa was to serve the utilitarian functions of performance venue, gathering space, and people-mover. Although Chef-fins and Jones testified passionately about La Contessa’s beauty and the artistic expression they felt it embodied — and it is an impressive work of art in many respects— I conclude it is applied art because its aesthetic appeal was subservient to its primary utilitarian purpose. Thus, the VARA claim fails.
VARA has spawned comparatively little litigation over the last quarter-century, and I hope that no spasm of artistic destruction or mutilation changes this trend. However, given the unique protections under VARA and the inherent difficulties in defining “visual arts” and “applied arts,” the arts, the art world, and the legal community would benefit from a more nuanced and flexible test for determining the scope of VARA’s protection of artistic works.

. In 1934, Rivera’s unfinished mural was removed from the wall of the RCA building and destroyed over the course of a weekend. The Rockefellers apparently made this decision due to Rivera's refusal to omit the figure of Lenin from his work. See Rivera RCA Mural is Cut from Wall, N.Y. Times, February 13, 1934, at 21. Indeed, the mutilation of a Picasso painting, Trois Femmes, by two Australian "entrepreneurs” was significant to the passage of VARA. See H.R. Rep. No. 101-514, at 17.

. Although Twitchell's generous settlement was heralded as "a vindication of artists’ moral rights under VARA, the case provides no judicial precedent on this matter.” Charles Cronin, Dead on the Vine: Living and Conceptual Art and VARA, 12 Vanderbilt J. Ent. & Tech. L. 209, 219 n.49 (2010).

. The Berne Convention secures "the protection of the rights of authors in their literary and artistic works,” Berne Convention for the Protection of Literary and Artist Works, art. 1, July 24, 1971, S. Treaty Doc. No. 99-27 (1986), including moral rights "[t]o claim authorship” and "to object to certain modifications and other derogatory actions,” id. at art. (ibis. The United States acceded to the Berne Convention in 1988, but did not recognize moral rights until Congress enacted VARA two years later. Swack, supra at 363.

. Indeed, examples of original "pictoral, graphic, and sculptural works” protected by copyright include dolls and toys, mosaics, and stained glass designs. United States Copyright Office, Circular 40.0915, Copyright Registration for Pictorial, Graphic, and Sculptural Works (2015).

. Hannah Ellis-Petersen, Tracy Emin’s Messy Bed Goes on Display at Tate for First Time in 15 Years, The Guardian (Mar. 30, 2015, 10:41 AM), http://www.theguardian.com/uk-news/ 2015/mar/3 O/tracey-emins-messy-bed-displayed-tate-britain-first-time-in-15 -years.

. Rodin envisioned Dante sitting and contemplating the scenes of eternal damnation portrayed on the Gates. Albert E. Elsen, Rodin’s Thinker and the Dilemmas of Modem Public Sculpture 43 (1985).

. Le Tricorne has found a new home at the New York Historical Society. Benjamin Muller, After 55 Years in Vaunted Spot, a Picasso Is Persuaded to Curl, N.Y. Times, Sept. 7, 2014, at A14.

. Chihuly's work is heralded for "rendering] meaningless the distinctions between utilitarian product and art, art and craft, beauty and function." Patterson Sims, Suola di Chihuly: Venezia and Seattle, in Dale Chihuly: Installations 1964-1992 (1992).

. The story of this fascinating dispute is outlined in Christopher J. Robinson's note: The “Recognized Stature” Standard in the Visual *602 Artists Rights Act, 68 Fordham L. Rev. 1935, 1958 (2000). The parties did not contest that the work was a sculpture, but fought bitterly over whether the visual art was of "recognized stature.” Id.

. This document is available on-line at ftp://ftp.wipo.int/pub/library/ebooks/historical-ipbooks/GuideToTheBerneConventionForThe-ProtectionOfLiteraryAndArtisticWorksPari-sActl971.pdf