Walter T. WALKER, III, Appellant,

v.

ACTION INDUSTRIES, INC.; Amos
Comay; Sholom D. Comay; Ernest
S. Berez, Appellees.

No. 85–1407.

United States Court of Appeals,
Fourth Circuit.

Argued April 10, 1986.

Decided Oct. 1, 1986.

Bradley G. McDonald (John F. Karl, Jr., McDonald & Karl, Washington, D.C., B.G. Stephenson, Stephenson & Balthrop, Ltd., Fairfax, Va., William B. Moore, Bean, Kinney, Korman, Hylton & Moore, Arlington, Va., on brief), for appellant.

Bernard Marcus (Robert L. Potter, Susan A. Gromis, Titus, Marcus & Shapira, Pittsburgh, Pa., John S. Stump, Janis Orfe, Boothe, Prichard & Dudley, McLean, Va., on brief), for appellees.

Before WIDENER, MURNAGHAN and ERVIN, Circuit Judges.

ERVIN, Circuit Judge:

Walter T. Walker, III, appeals the jury verdict against him on his claim for violations of § 10(b)[1] of the Securities Exchange Act of 1934 and SEC rule 10b–5[2] based on alleged material omissions in a tender offer statement and press release issued by Action Industries, Inc. (Action). Walker also appeals the district court's directed verdict on his state law claim against certain directors of Action for breach of fiduciary duty, the court's denial of his motion for class certification, various evidentiary rulings and allegedly prejudicial comments by the trial judge. We conclude that the jury was instructed properly that the corporation did not have a duty to disclose its financial projections.

1. Section 10(b) prohibits the use of any "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe," "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b) (1982).

2. Rule 10b–5, promulgated by the SEC pursuant to § 10(b), provides that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or any facility of any national securities exchange,

.    .    .    .    .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements

Thus, the jury's verdict on the rule 10b–5 claim is unimpeachable. We also conclude that Walker's other bases for challenging the judgment below do not constitute reversible error. Accordingly, we affirm.

I.

On July 16, 1982, Action[3] made a tender offer to purchase 15% of its common stock at $4.00 per share until August 6. In connection with the tender offer, Action issued a tender offer statement pursuant to rule 13e–4,[4] which contained financial information on the corporation. Action's fiscal year runs from July through June. The tender offer statement disclosed audited financial statements for fiscal years 1979, 1980 and 1981. These figures revealed a net loss of $2,306,900 in fiscal 1979, net earnings of $372,900 in fiscal 1980, and net earnings of $731,200 in fiscal 1981. Because the 1982 fiscal year had just ended, audited financial statements for that year were not available. Action did disclose, however, unaudited, interim financial statements for fiscal 1982 through March 27, 1982, the end of Action's third fiscal quarter. These figures indicated a net loss of $4,014,900 as compared with net earnings of $1,037,600 for the same period in the previous year. In § 14B of the tender offer statement, Action also made disclosures entitled "Events Subsequent to March 27, 1982," which stated in part:

The Company's fiscal year ended on June 26, 1982. Although financial statements

made, in the light of the circumstances under which they were made, not misleading.... 17 C.F.R. § 240.10b–5 (1985).

For convenience, Walker's claim will be referred to as a rule 10b–5 claim.

3. Action is primarily a housewares marketing corporation which sells promotional programs for such products to large retail chain stores. Action provides the retailers with advertising, merchandise and on-site displays.

4. Rule 13e–4, 17 C.F.R. 240.13e–4 (1985), promulgated by the SEC pursuant to § 13(e)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(e)(1) (1982), establishes filing and disclosure requirements for tender offers by a "reporting company" for its own shares.

have not yet been prepared or audited, the Company expects results from continuing operations to reflect a sales increase compared with the prior year. However, earnings from continuing operations are estimated to be somewhat lower than last year as a result of lower gross margins on sales and higher operating expenses.

In addition to financial statements, Action regularly prepared a number of other financial reports internally. On a weekly basis, Action prepared "work projections," which recorded actual orders and identified them as "firm" or "anticipated," depending on their likelihood of cancellation. Approximately monthly, Action prepared "gross sales forecasts." These reports projected monthly and quarterly sales based on the orders reflected in the weekly work projections. Action also tracked actual financial results in weekly "flash sales reports," which showed sales for the current week, month-to-date sales and quarter-to-date sales.

As early as May 1982, Action's internal financial reports indicated substantial increases in actual orders and projected sales for the first quarter of fiscal 1983 over the same period for fiscal 1982. As the July 16 tender offer grew nearer, and the first quarter of fiscal 1983 began, subsequent internal reports indicated even more substantial increases in actual orders and projected sales, as well as increases in actual sales over the prior year. Action, however, did not disclose the projected increases in sales or the increases in actual orders and sales in the tender offer statement, which was issued approximately twenty days into its first quarter of fiscal 1983.

At the time of the tender offer, Walker owned 2000 shares of Action which he had purchased in April 1982, at $3.25 per share. Walker learned of the July 16 tender offer from his broker, and based on that information, anticipated improved prospects for the company. Then, on July 21, without actually having received or read the tender offer statement, Walker purchased an additional 1500 shares of Action at $4.00 per share. Subsequently, Walker received and read the tender offer statement. The tender offer ended on August 6 without Walker having tendered or sold any of his shares.

On August 18, 1982, Action issued a press release regarding its year-end financial results for fiscal 1982. The press release and Action's audited financial statements, on which the press release was based, essentially confirmed the statements made in § 14B of the tender offer statement regarding the company's financial performance in fiscal 1982; sales were up but earnings were down. Between the time of the tender offer and the press release, Action's internal financial reports continued to indicate substantial increases in projected sales, and actual orders and sales, for the company's first quarter of fiscal 1983 and thereafter. As with the tender offer statement, however, Action refrained from disclosing such information in the press release. Walker read the press release and concluded that the company's prospects were not favorable. On September 21, he sold all of his Action shares on the open market at approximately $5.25 per share.

Action's stock traded as high as 7⅛ per share on October 21. Then on October 28, Action issued a press release revealing its financial results for the first quarter of fiscal 1983 ending September 25, 1982. The release and accompanying unaudited, interim financial statements showed a 75% increase in sales, and net earnings of $1,467,600 compared with a net loss of $412,500, for the same period in the previous year. The following day, on October 29, Action stock traded as high as 9⅞. By November 12, the stock reached 15¾ per share.

Subsequently, Walker brought suit against Action and three of its directors. Walker pursued a claim under rule 10b–5 alleging that defendants had a duty to disclose financial projections and actual orders and sales for fiscal 1983 in the tender offer statement and the August 18 press release. Defendants' failure to make such disclo-

sures, alleged Walker, constituted omissions of material facts in violation of rule 10b–5. As damages, Walker sought the difference between the price he received for his shares on September 21 and the price he would have received if he had not sold them until November 12. Based on essentially the same allegations, Walker pursued a claim against the directors for breach of fiduciary duty under Pennsylvania's common law. On his state law claim, Walker sought compensatory, as well as punitive damages.

Before trial, the district court denied Walker's motion to have the suit certified as a class action and denied Action's motion for dismissal or summary judgment. At trial, after the close of Walker's case, the court granted Action's motion for a directed verdict on Walker's breach of fiduciary duty claim. Although the court removed the tender offer statement from the case,[5] Walker's 10b–5 claim went to the jury for a determination of whether there were mate-

rial omissions in the press release. The jury returned a verdict against Walker and this appeal followed.

## II.

In the context of the purchase and sale of securities, rule 10b–5 prohibits misstatements of material facts or omissions of material facts, which are necessary under the circumstances to make the statements made not misleading. *See* 17 C.F.R. § 240.10b–5. In order for there to be liability under 10b–5 for omissions or nondisclosure, however, a "duty to speak" must exist. *See Starkman v. Marathon Oil Company,* 772 F.2d 231, 238 (6th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978, 984 (3d Cir.1984). Furthermore, if such a duty exists, only omissions of material[6] facts are actionable. *See id.* In this case, it is undisputed that defendants had a gen-

**5.** Walker based his 10b–5 claim on omissions in both the tender offer statement and August press release. The tender offer statement initially was conditionally admitted into evidence and discussed at trial. However, at the close of plaintiff's case, the district court struck the tender offer statement from the evidence and instructed the jury that only the alleged omissions in the press release were actionable. The exact basis of the district court's ruling is unclear. The district court stated to the jury in part: "I also ruled that once a tender offer is made by a company for its own shares, then when the tender offer expires, that the tender offer has no half life. That it is no longer an actionable piece of information after stockholders either react to it or don't react to it. In this case, Mr. Walker didn't react to it, and he then sold about six weeks after that based upon other information. And the only other information that was released by the company was [the] press release." Joint Appendix at 708. Thus, it appears that the district court may have excluded the tender offer statement because Walker did not sell his stock in reliance on the tender offer statement—a prerequisite to recovery under 10b–5—but instead sold in reliance on the press release. Regardless of the basis for the court's ruling, however, we do not find reversible error in the withdrawal of the tender offer statement from the jury. Walker's arguments regarding disclosure applied equally to the tender offer statement and the press release. Both were allegedly deficient in that they omitted financial projections, as well as actual or-

ders and sales, regarding fiscal year 1983. Therefore, with the press release before them, the jury was able to consider fully Walker's theory that Action violated 10b–5 by failing to disclose this information. Accordingly, he was not prejudiced by the district court's ruling.

Walker argues, nevertheless, that keeping the tender offer statement from the jury precluded them from finding 10b–5 liability on alleged misstatements in the statement, as opposed to omissions, that were not contained in the press release. Again, Walker was not prejudiced. Section 14B of the tender offer statement only contained statements regarding the fourth quarter of fiscal 1982. Contrary to Walker's assertion, they did not describe Action's financial prospects for fiscal 1983. The statements regarding 1982 were accurate and not misleading, and therefore, were not actionable under 10b–5 as misstatements. Overall, we uphold the district court's ruling.

**6.** In the context of Rule 14a–9, *see infra* note 7, which governs disclosure in proxy statements, the Supreme Court has defined "material" in part as follows: "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in [making his decision]." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This definition also has been held applicable in cases arising under rule 10b–5. *See, e.g., Starkman v. Marathon Oil Company,* 772 F.2d at 238.

eral duty to speak or disclose in connection with the tender offer and subsequent press release. Thus, Walker's claim presented a question of whether defendants had breached their duty to disclose, and thus violated rule 10b–5, through material omissions in the August 18 press release.

Walker challenges the jury's verdict against him on his 10b–5 claim on the basis of allegedly erroneous jury instructions. Specifically, he challenges the district court's instruction that: "There is no duty on a corporation to disclose future projections. However, it can do so voluntarily." Joint Appendix at 835. Walker argues that the district court should have instructed the jury that defendants did have a duty to disclose its financial projections for fiscal 1983. Furthermore, Walker argues that the court should have instructed that defendants had a duty to disclose actual orders and sales for the same period.

■ We turn first to Walker's argument that the district court should have instructed the jury that Action had a duty to disclose its financial projections. Historically, the Securities Exchange Commission (SEC) has discouraged the disclosure of financial projections and other "soft" information such as asset appraisals in proxy statements, tender offers and other disclosure documents on the ground that they were likely to mislead investors. *See South Coast Services Corp. v. Santa Ana Valley Irrigation Co.*, 669 F.2d 1265, 1271 (9th Cir.1982); *Gerstle v. Gamble-Skogmo, Inc.*, 478 F.2d 1281, 1292–94 (2d Cir.1973); *see also Flynn v. Bass Brothers Enterprises*, 744 F.2d at 985; *Starkman v. Marathon Oil Company*, 772 F.2d at 239–40. For example, in 1956 the SEC added a note to rule 14a–9 [7] which listed "predictions as to specific future market values, earnings or dividends" as "examples of what, depending upon particular facts and circumstances, may be misleading" in proxy statements. SEC Sec.Exch.Act Rel. No. 5276 (Jan. 30, 1956), 21 Fed.Reg. 578 (1966).

The traditional SEC position, however, encountered substantial criticism in the early 1970s. *See* T. Hazen, *The Law of Securities Regulation* at 78 (1985) (citing commentators); A. Bromberg and L. Lowenfels, *Securities Fraud and Commodities Fraud* § 6.5 (431)(3), at 136.123 (1985) (same). Then, in 1976, the SEC deleted earnings projections in the 14a–9 note from the list of potentially misleading disclosures. *See* SEC Sec.Act Rel. No. 5699 (April 23, 1976), *reprinted in* [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,461 (1976). In 1978, the SEC also adopted rule 175, which provides a "safe harbor" for "forward-looking statements" made in good faith. *See* 17 C.F.R. § 230.-175 (1985); SEC Sec.Act Rel. No. 6084 (June 25, 1979), *reprinted in* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,117 (1979) (effective 1979). Forward-looking statements are defined to include "a statement containing a projection of revenues, income (loss), earnings (loss) per share, capital expenditures, dividends, capital structure or other financial items." 17 C.F.R. § 230.175(1). Rule 175, however, does not require the disclosure of financial projections. *See Starkman v. Marathon Oil Company*, 772 F.2d at 240; *Dower v. Mosser Industries, Inc.*, 648 F.2d 183, 188 n. 5 (3d Cir.1981); *Mendell v. Greenberg*, 612 F.Supp. 1543, 1550 n. 8 (S.D.N.Y.1985); T. Hazen, *supra*, at 78 n. 26. Thus, the SEC currently allows or permits disclosure of financial projections on a voluntary basis.

■ The circuits which have addressed whether there is a duty to disclose financial projections, and other soft information such as asset appraisals, have reached varying results. These can be described as falling into three groups. First, the Seventh Circuit would appear to take the position that there is no duty to disclose financial projections. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir.) (no duty to disclose financial projections; rule

**7.** Rule 14a–9, 17 C.F.R. § 240.14a–9 (1985), promulgated by the SEC pursuant to § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C.

§ 78n(a) (1982), regulates disclosures in proxy statements.

10b–5 and § 14(e) [8] claim for material omissions in press release designed to thwart exchange offer by another company), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981). Although the Second Circuit has not considered whether there is a duty to disclose financial projections, it has declined to recognize a duty to disclose asset appraisals. *See Gerstle v. Gamble-Skogmo, Inc.,* 478 F.2d at 1294 (rule 14a–9 claim for material omissions in proxy statement). Thus, it appears that the Second Circuit also would not impose a duty to disclose financial projections. *See Mendell v. Greenberg,* 612 F.Supp. 1543, 1550 (S.D. N.Y.1985) (citing *Gerstle* as authority that there is no duty to disclose financial projections in the Second Circuit); *cf. Reiss v. Pan American World Airways, Inc.,* 711 F.2d 11, 14 (2d Cir.1983) (no duty to disclose merger negotiations; rule 10b–5 claim for material omissions in press release announcing debenture call).

Second, the Third Circuit has held that "[c]ourts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis." *Flynn v. Bass Brothers Enterprises, Inc.,* 744 F.2d 978, 988 (3d Cir.1984) (rule 10b–5 and § 14(e) claim for material omissions in tender offer statement). *But see Kohn v. American Metal Climax, Inc.,* 458 F.2d 255, 265 (3d Cir.), *cert. denied,* 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) (discouraging disclosure of soft information). Whether there is duty to disclose soft information in a given case depends on a number of factors announced by the *Flynn* court.[9] In *Flynn,* however, the court declined to apply its newly announced standard retroactively. *See* 744 F.2d at 988. Moreover, applying pre-*Flynn* standards, it found no duty to disclose the soft information at issue in that case. *See id.* at 988–91.

A third approach has been adopted by the Sixth Circuit. It has ruled that there is no duty to disclose financial projections unless they are "substantially certain." [10] *See Starkman v. Marathon Oil Company,* 772 F.2d at 241–42 (rule 10b–5 claim for material omissions in press release designed to thwart tender offer); *James v. Gerber Products Co.,* 587 F.2d 324, 327 (6th Cir.1978) (rule 10b–5 claim for failure to disclose in connection with shareholder's sale of stock back to issuing company); *see also Radol v. Thomas,* 772 F.2d 244, 252–53 (6th Cir.1985); *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 216 (6th Cir.1984). While the Sixth Circuit's "substantially certain" test appears similar to the "case by case" approach announced by the Third Circuit in *Flynn,* the Sixth Circuit has rejected *Flynn* as, among other things, "uncertain and unpredictable." *Starkman,* 772 F.2d at 242. It should also be noted that the Sixth Circuit in applying its "substantially certain" test, has yet to impose a duty to disclose financial projections in any case.

The Ninth Circuit appears properly categorized with the Sixth. In *Vaughn v. Teledyne, Inc.,* the Ninth Circuit found no duty to disclose financial projections where there was "no evidence ... that the estimates were made with ... reasonable certainty." 628 F.2d 1214, 1221 (9th Cir.1980) (rule 10b–5 and § 14(e) claim for material omissions in tender offer statement); *see*

---

**8.** Section 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e) (1982), prohibits material misstatements, omissions and fraudulent practices in connection with tender offers.

**9.** The factors a court must consider in making such a determination are: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is

unique; and the availability to the investor of other more reliable sources of information. *Flynn,* 744 F.2d at 988.

**10.** The Sixth Circuit's decision in *Levinson v. Basic, Inc.,* 786 F.2d 741 (6th Cir.1986), is not to the contrary. That case involved the disclosure of merger negotiations rather than financial projections or soft information, and thus, is distinguishable. Moreover, the court imposed a duty to disclose the negotiations primarily because the corporation had denied having engaged in them in a statement explaining heavy trading activity in their stock. *Id.* at 746–47.

*also South Coast Services Corp. v. Santa Ana Valley Irrigation Co.,* 669 F.2d 1265, 1272 (9th Cir.1982) (no duty to disclose "subjective" asset appraisals; rule 14a–9 claim for material omissions in proxy statement).

The Fourth Circuit has not had the occasion to consider the issue of whether there is a duty to disclose financial projections. Walker argues that our decision in *Lockspeiser v. Western Maryland Company,* 768 F.2d 558 (4th Cir.1985), controls this case. In *Lockspeiser,* the plaintiff alleged that the corporation violated rule 10b–5 and § 14(a) by omitting material facts regarding coal and timber reserves in a merger notice accompanied by a proxy statement. We reversed the district court, which had dismissed in part because the omissions were not material as a matter of law, and remanded for a determination of materiality. However, we distinguished that case from cases which involve financial projections or asset valuations. 768 F.2d at 561. Accordingly, *Lockspeiser* is not controlling here. Now faced with a case that involves financial projections, we conclude that under the circumstances of this case Action had no duty to disclose its financial projections in the August 18 press release, for the reasons that follow.[11]

First, we note that Action made disclosures regarding its tender offer pursuant to rule 13e–4, which governs disclosures in the context of a corporation's tender offer for its own stock. Rule 13e–4 and its accompanying schedule 13E–4, 17 C.F.R. § 240.13e–101 (1985), require that certain information be disclosed. That information includes audited financial statements for the company's two most recent fiscal years and unaudited financial statements for the company's most recent quarter. *See id.* at Item 7(1) and (2). There is no requirement under these regulations that financial projections be disclosed. Thus, the SEC has declined to impose expressly a duty to disclose such information in the context of 13e–4 tender offer statements. It follows

that there was a similar absence of any express duty to disclose financial projections in the subsequent press release.

Second, the SEC has not imposed a duty to disclose financial projections in disclosure documents generally. As already noted, financial projections were discouraged by the SEC for approximately twenty years. Now, such disclosures are allowed or permitted. The transition from nondisclosure to permissive disclosure was heralded primarily by the SEC's modification of its regulations such as the adoption of voluntary disclosure provisions in rule 175. We perceive the current SEC regulatory environment to be an experimental stage regarding financial projection disclosures. Respecting these evolutionary processes, we believe that a further transition, from permissive disclosure to required disclosure, should be occasioned by congressional or SEC adoption of more stringent disclosure requirements for financial projections, rather than by the courts.

Third, we are reluctant to recognize a duty to disclose financial projections in this case because of their uncertainty and their potential to mislead investors. Walker would have us impose a duty on Action to disclose its "gross sales forecasts," which projected monthly and quarterly sales. On May 20, 1982, the projections indicated a 30% increase in sales, based on firm orders, for the first quarter of fiscal 1983 compared with the previous year's first quarter. Projections dated June 17 indicated a 95% increase. On July 15 they indicated a 109% increase and on August 6, 129%. Clearly, the projections were changing constantly, with each new one rendering the last incorrect. A disclosure of the May or June projections would have grossly understated subsequent projections. Furthermore, the projections failed to reflect accurately actual sales. As the first quarter of fiscal 1983 progressed, Action's "flash sales reports" showed a quarter-to-date sales increase over the first quarter of fiscal 1982 of 166% on July 3. By July 17,

11. We do not specifically adopt any of the various positions held by the other circuits regarding whether a duty exists to disclose financial projections.

that figure had dropped precipitously to 42%, but by August 7 it had jumped to 134%. Most importantly, the quarter ended with an actual sales increase of 75% compared with over 129% projected. Net income, however, increased tenfold, a performance hardly forewarned by the projections. Because of the evident uncertainty and misleading nature of the projections, we deem it unwise to require their disclosure. Indeed, in light of the disparity between actual and projected sales, we wonder whether Walker also would have sued had the disclosures been made, alleging that the projections were overly optimistic. *See Panter*, 646 F.2d at 291 (rule 10b–5 and § 14(e) claim for material omissions in press release which allegedly projected the company's prospects as too "rosy.")

Finally, we believe that the projection disclosures sought by Walker are impractical. Action made its "gross sales forecasts" at least monthly and sometimes more frequently. Also, as described above, each forecast was substantially different. Because of the frequency and volatility of these projections, the imposition of a duty to disclose them would have required virtually constant statements by Action in order not to mislead investors. Under these circumstances, we deem the projection disclosures urged by Walker to be impractical, if not unreasonable.

■ For all of these reasons, we conclude that defendants did not have a duty to disclose Action's financial projections.[12] Therefore, the district court's instruction that "[t]here is no duty on a corporation to disclose future projections" is not reversible error in this case. We do not hold that there is no duty to disclose financial projections under any circumstances. To that extent, the district court's instruction arguably was error. However, any error was harmless because Action had no such duty under the circumstances of this case. We also note that our holding is not intended to discourage disclosures of financial projections. Indeed, we fully support voluntary disclosure as contemplated by rule 175. Of course, it would appear prudent to release only those projections that are reasonably certain. *See Panter*, 646 F.2d at 292; *Vaughn*, 628 F.2d at 1221. Furthermore, if a company undertakes projection disclosures, it must make the full disclosures necessary to avoid making the statements misleading. *See id.*

■ We now consider Walker's argument that the district court should have instructed the jury that defendants had a duty to disclose Action's actual orders and sales for fiscal 1983 in the press release. Walker argues that Action's actual orders and sales were not financial projections or soft information, but rather, they were hard facts. Of course, it is his position that there was a duty to disclose the projections, as well as these facts. The distinction made by Walker, however, also implies the argument that even if there was no duty to disclose the projections, there was a duty to disclose facts, such as the actual orders and sales. On one hand, the distinction arguably has merit. Actual orders and sales clearly are certain, in contrast to the projections. On the other hand, disclosure of the orders and sales in this case envoke the problems of misleading investors and impracticality described above in connection with the projections. Under the circumstances of this case, we need not decide the question of whether defendants had a duty to disclose the actual orders and sales in order to reach our conclusion that the district court did not err in failing to give the instructions now urged by Walker.[13]

Walker did not request an instruction at trial on the duty to disclose actual orders

---

12. Stated another way, as a matter of law, defendants' failure to disclose the financial projections was not an omission of material facts, which were necessary under the circumstances to make the statements made not misleading.

13. The Third Circuit's decision in *Rothberg v. Rosenbloom*, 771 F.2d 818 (3d Cir.1985), is not pertinent to this issue. That case, which found a duty to disclose actual orders, involved insider trading, unlike the circumstances of this case. *See generally* T. Hazen, *supra*, § 13.9 (discussing insider trading).

and sales. He thus waived his right to challenge on appeal the district court's failure to give such an instruction. *See Cowen v. Fulton,* 407 F.2d 93, 94 (4th Cir.1969); *Harmsen v. Smith,* 693 F.2d 932, 939 (9th Cir.1982), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); 9 C. Wright and A. Miller, *Federal Practice and Procedure* § 2552, at 624 (1971). Also, the district court did not preclude the jury from considering Walker's theory that defendants' failure to disclose the orders and sales constituted material omissions in violation of rule 10b–5. That is, the district court did not instruct the jury that there was *no* duty to make such disclosures, even though that instruction was requested by defendants. *See* Joint Appendix at 843. Indeed, Walker in effect argued to the jury that the orders and sales were not projections, but instead were facts, were material, and thus, were required to be disclosed. Joint Appendix 801–806. We, therefore, can find no prejudice to Walker's case from the absence of the instruction. Overall, the jury had a full opportunity to decide in favor of Walker on this theory, but they found against him. Accordingly, we conclude that the district court's failure to give an instruction regarding actual orders and sales was not error. Therefore, the verdict must stand. Our holding is narrow. We do not reach the question of whether there was a duty to disclose the actual orders and sales in this case or, if the district court had been requested to give such an instruction, whether its failure to do so would have been error. We only hold that it was not error for the district court to fail to give such an instruction under the circumstances of this case, in light of Walk-er's failure to request the instruction and the jury's opportunity to consider fully Walker's theory of recovery.

## III.

Walker also challenges the district court's directed verdict on his state law claim. Under that claim, Walker had maintained that the defendant directors owed a fiduciary duty to him as a shareholder pursuant to Pennsylvania's common law.[14] He further alleged that the directors had breached that duty by omitting material facts from certain disclosure documents as described earlier. The rationale for the court's directed verdict is not entirely clear. It appears that the court rejected Walker's position that the directors owed the shareholders a fiduciary duty under Pennsylvania law, believing that such a relationship existed only between the directors and the corporation. *See* Joint Appendix at 675–05. We conclude that under Pennsylvania law directors do owe a fiduciary duty to shareholders. *See Higgins v. Shenango Pottery Company,* 256 F.2d 504, 507–08 (3d Cir.1958) (citing *Bailey v. Jacobs,* 325 Pa. 187, 189 A. 320 (1937)); 8A Pennsylvania Law Encyclopedia § 264, at 368 (1971). Nevertheless, we uphold the directed verdict.[15] Despite the existence of the fiduciary duty, Walker has not proffered, and we have been unable to find, any Pennsylvania authority that would recognize the allegations in this case as stating a claim for breach of that duty. Accordingly, we do not find error in withdrawing the state law claim from the jury.[16]

---

**14.** Action is incorporated in Pennsylvania. Walker is a citizen of Virginia. The parties agree that Pennsylvania law controls Walker's state law claim.

**15.** Even if the district court's reasoning is erroneous as a matter of law, reversal is not required if the court reached the right result. *See Eltra Corp. v. Ringer,* 579 F.2d 294, 298 (4th Cir.1978).

**16.** Walker's claim for punitive damages in connection with the alleged breach of fiduciary duty, therefore, also was disallowed properly by the district court.

After the district court directed a verdict on the breach of fiduciary duty claim, Walker moved to amend his complaint under Fed.R. Civ.P. 15(b) to allege a claim for common-law fraud. After reviewing the record, we conclude that the district court did not abuse its discretion in denying the motion. *See American Hot Rod Association, Inc. v. Carrier,* 500 F.2d 1269, 1275–76 (4th Cir.1974).

We have also considered Walker's appeal of the district court's denial of class certification. This issue is moot because we affirm Walker's failure to prevail on the merits of his claim. Moreover, we conclude that the district court's ruling was neither clearly erroneous nor an abuse of discretion. *See Roman v. ESB, Inc.*, 550 F.2d 1343, 1349 (4th Cir.1976) ("The determination of a district court that an action does not meet the requirements of a class action will not be disturbed unless it is clearly erroneous. And generally, unless abuse is shown, the trial court's decision on this issue is final.") (citations omitted).

■ Walker also seeks to overturn the district court on the basis of several evidentiary rulings. Walker argues that the court committed reversible error in requiring him to present oral summaries of lengthy depositions, rather than reading them verbatim to the jury. Furthermore, he argues that the district court erred in conditionally admitting some of his exhibits into evidence and later striking them after the close of all the evidence. We reject his arguments primarily because he has failed to direct this court to any objections below regarding these procedures. Thus, these issues were not preserved for appeal. Also, we recognize that the district court's use of such procedures was a legitimate exercise of its inherent discretionary power to ensure the orderly and expeditious administration of the trial. *Link v. Wabash Railroad Company*, 370 U.S. 626, 630–31, 82 S.Ct. 1386, 1388–89, 8 L.Ed.2d 734 (1962).

Finally, Walker seeks reversal on the ground that comments from the bench prejudiced his case. At least twice during Walker's case in chief, his counsel was reprimanded harshly by the district court, in the presence of the jury, concerning counsel's manner of presentation. Although we do not condone the court's conduct, we do not find reversible error.

AFFIRMED.