## In re EXABYTE CORPORATION SECURITIES LITIGATION.

### Civ. A. No. 92–K–1896.

United States District Court, D. Colorado.

June 8, 1993.

James A. Shpall, Wolf & Slatkin, Denver, CO, Richard B. Dannenberg, Neil L. Selinger, Lowey Dannenberg Bemporad & Selinger, P.C., New York City, and Alan Schulman and Kevin P. Roddy, Milberg Weiss Bershad Specthrie & Lerach, San Diego, CA, for plaintiff/petitioner.

Jeffrey B. Rudman, Peter J. MacDonald, Hale & Dorr, Boston, MA, and Nancy J. Gegenheimer, Holme Roberts & Owen, Denver, CO, for defendant.

## ORDER ON MOTION TO DISMISS

KANE, Senior District Judge.

This is a putative class action for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and Securities and Exchange Commission (SEC) Rule 10b–5, 17 C.F.R. § 240.10b–5 (1992). Plaintiffs, members of an alleged class consisting of persons who purchased stock in the Exabyte Corporation between March 6 and September 23, 1992,[1] claim that the corporation and two of its senior officers violated federal securities laws by failing to disclose certain factors leading to decreased gross margins on the corporation's sales of computer storage devices for the third quarter of 1992. Defendants move to dismiss, arguing that the complaint alleges nothing more than fraud by hindsight. For the reasons explained below, I grant the motion.

### I. *Facts.*

The Exabyte Corporation is a Delaware corporation that manufactures high capacity 8mm tapes that quickly and efficiently store large amounts of data on a small cartridge. Founded in 1987, the corporation introduced its baseline product, the EXB–8200, that year. It introduced a faster, higher capacity model, the EXB–8500, in 1990. The EXB–8200 and the EXB–8500 are the corporation's principal products.

Exabyte markets these products to two groups of customers: (1) original equipment manufacturers ("OEMs") and (2) value added resellers ("VARs"), system integrators and distributors. The company initially sold its EXB–8200 systems both directly and through distributors to VARs and system integrators, who are more receptive to new technology. Since OEMs are more conservative about incorporating new components into their systems, preferring to conduct extensive tests on them, sales to OEMs normally lag behind those to VARs and system integrators. Exabyte generally receives higher profit margins on sales to VARs than on sales to OEMs. Sales figures for 1989, 1990 and 1991 reflected an initially high ratio of sales to VARs, decreasing as OEMs accepted the products.

With the introduction of the EXB–8500 in 1990, the company expected this sales pattern, and its historically healthy profit margins, to continue. Contrary to its past record, however, Exabyte announced on September 22, 1992 that it expected gross margins on its products for the third quarter of 1992 to be significantly lower than historical levels. The company attributed this erosion in profits to weak sales of its newer product, the EXB–8500, to higher-margin VARs. Following this disclosure, the value of the company's stock plummeted from its pre-announcement value of $23.625 per share to as low as $14.50 per share.

Within eighteen days after the company's announcement, eight lawsuits were filed alleging securities violations by Exabyte and its top management. I consolidated these cases for all purposes under Fed.R.Civ.P. 42 on January 7, 1993. Plaintiffs filed their consolidated amended class action complaint on January 22, 1992, naming as defendants the Exabyte Corporation, Peter D. Behrendt, Exabyte's president and chief executive officer, and William L. Marriner, Exabyte's senior vice-president and chief financial officer. The complaint is predicated on the "fraud on the market" theory. *See generally Basic, Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988).

---

1. Plaintiffs' motion for class certification is pending.

Defendants moved to dismiss the complaint on February 10, 1993.

## II. *Merits.*

### A. *Sufficiency of the Complaint Under Rule 9(b).*

■ Defendants first contend that Plaintiffs have failed to plead fraud with particularity as required by Fed.R.Civ.P. 9(b). Courts strictly enforce Rule 9(b) in connection with claims under the securities laws, "requiring detailed statements of the specific conduct which allegedly violated the statutes in question." *Farlow v. Peat, Marwick, Mitchell & Co.*, 956 F.2d 982, 986 (10th Cir. 1992). Thus, on a motion to dismiss under Rule 9(b), I examine the complaint to determine whether Plaintiffs have "set forth the time, place and contents of the false representation, the identity of the party making the false statement and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds (In re Edmonds)*, 924 F.2d 176, 180 (10th Cir.1991).

■ Defendants' primary objection to the complaint is that Plaintiffs' allegations of fraudulent intent are based on "information and belief."[2] The plain language of Rule 9(b), however, permits malice, intent, knowledge and other condition of the mind to be averred generally. *See Scheidt v. Klein*, 956 F.2d 963, 967 (10th Cir.1992); *Phelps v. Wichita Eagle–Beacon*, 886 F.2d 1262, 1270 (10th Cir.1989). Thus, the scienter requirement of a securities fraud claim may be averred generally at the pleading stage, particularly when the complaint alleges that the defendants released misleading information falsely portraying a company's financial condition. *See In re Adobe Sys., Inc. Sec. Litig.*,

767 F.Supp. 1023, 1028 (N.D.Cal.1991). Plaintiffs have further alleged unusual levels of insider trading during the class period, which itself is sufficient to establish scienter. *See In re Apple Computer Securities Litigation*, 886 F.2d 1109, 1117 (9th Cir.1989), *cert. denied*, 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990).

With respect to the other essential elements of Plaintiffs' claims, the complaint is not deficient under Rule 9(b). It sets forth by quotation the alleged false representations, identifies their source and the date they were disclosed and, with one exception,[3] explains why Plaintiffs believe they were fraudulent. *See Polycast Technology Corp. v. Uniroyal, Inc.*, 728 F.Supp. 926, 942 (S.D.N.Y.1989) (allegations specifying "time, place, speaker and content of alleged misrepresentations" sufficient under Rule 9(b) to state claim for securities fraud based on false projections). Consequently, I deny the motion to dismiss under Rule 9(b).

### B. *Sufficiency of Complaint Under Rule 12(b)(6).*

Defendants' second argument is that the complaint fails to state a claim for securities fraud. Under Fed.R.Civ.P. 12(b)(6), dismissal is proper only if Plaintiffs "can prove no set of facts in support of their claims to entitle them to relief." *Boone v. Carlsbad Bancorporation, Inc.*, 972 F.2d 1545, 1551 (10th Cir.1992). In making this determination, I accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to Plaintiffs. *See Williams v. Meese*, 926 F.2d 994, 997 (10th Cir.1991).[4]

---

2. Defendants also argue that the complaint is deficient under Rule 9(b) because the alleged misrepresentations are "only a series of accurate historical statements by management about Exabyte." (Mem.Supp.Defs.' Mot.Dismiss at 6.) Since this argument does not focus on whether Plaintiffs have sufficiently identified the "who, what, when and how's" of the alleged fraud, *see Farlow*, 956 F.2d at 986, but whether the allegations are sufficient to state a claim, I address it in connection with my discussion of the sufficiency of the complaint under Rule 12(b)(6).

3. In paragraph 17 of the complaint, Plaintiffs quote four paragraphs from Defendant Beh-

rendt's letter to shareholders disseminated on April 9, 1992 with the annual report. They do not explain why they believe Behrendt's statements were misleading. As I discuss below, these statements are nevertheless insufficient to state a claim for securities fraud.

4. Defendants proffer for my consideration an appendix containing a number of documents referred to, but not included with, the complaint. In some circumstances, courts have permitted such a submission when the document is central to the complaint. *See, e.g., I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991). *But see Polycast*, 728 F.Supp.

The allegedly fraudulent disclosures take two forms. The first consists of statements made in SEC filings—the company's annual report (Form 10–K) for the 1991 fiscal year and quarterly reports (Form 10–Qs) for the first and second quarters of fiscal year 1992—and the company's annual report to shareholders. The second are statements made by securities analysts allegedly based on information provided by the Defendants. I consider these two forms of disclosures separately.

■ Looking first to the company's SEC filings and annual report, Plaintiffs point to the Form 10–K filed on March 6, 1992. The first passage cited contains two paragraphs describing the sales cycle for the company's tape subsystems. The initial paragraph begins with a discussion of the role of VARs and system integrators, noting that "initial sales were made directly and through distributors to VARs and system integrators, who are generally quicker to evaluate, integrate and adopt the new technology." (*See* Compl. ¶ 16(a).) It ends with a statement of the percentage of sales revenue attributable to sales to VARs and system integrators for the years 1989 through 1991. The next paragraph describes the sales cycle to OEMs, disclosing that the cycle can take from six to eighteen months while the OEM evaluates, tests and eventually incorporates Exabyte's product into its system. This paragraph likewise concludes with figures for sales revenues attributable to OEMs from 1989 through 1991. (*Id.*)

Plaintiffs contend that these paragraphs are misleading because they fail to disclose that, as of the date of the Form 10–K, "Exabyte was forced to depart from its historical sales practice described in the Form 10–K of making initial product sales to VAR's, distributors, system integrators, followed by sales to OEM's." (Compl. ¶ 16a.) In addition, Plaintiffs maintain that the statements were misleading "in failing to disclose that this trend of selling new 8500 products to OEMs first, rather than to VARs, distributors and system integrators, would continue

at least through fiscal 1992 and would worsen the Company's already deteriorating gross margins and earnings from its older 8200 product line." (*Id.* ¶ 16(b).)

■ Plaintiffs' contentions focus on the future balance of sales between VARs and OEMs and related gross margins for fiscal year 1992, not on the accuracy of the figures actually reported for 1989 through 1991. Yet, in this excerpt from the Form 10–K, the company made no predictions of sales ratios or gross margins for 1992. Corporations are under no duty to include projections of future performance in SEC filings. In fact, for many years, the SEC discouraged this. *See Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509, 514 (7th Cir.1989); *Walker v. Action Indus., Inc.,* 802 F.2d 703, 707 (4th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987). The reporting of historical data alone cannot be interpreted as a prediction of future performance. *See, e.g., In re Convergent Technologies Sec. Litig.,* 948 F.2d 507, 513 (9th Cir. 1991); *In re Apple Computer Sec. Litig.,* 886 F.2d at 1118–19; *In re Verifone Securities Litigation,* 784 F.Supp. 1471, 1481 (N.D.Cal. 1992). Furthermore, even if such data could be interpreted as a prediction, the trend shown was a *decrease* in sales to VARs and an *increase* in sales to OEMs, precisely what occurred in 1992. Therefore, Plaintiffs have failed to state a claim for securities fraud with respect to this passage from the Form 10–K.

Plaintiffs' reliance on four paragraphs from Defendant Behrendt's letter to shareholders contained in the company's annual report suffers a similar fate. In this letter, Behrendt reported the company's revenue, net income and net margin figures for the year. The only forward-looking passage in this letter states, "[m]arket acceptance of [the company's] products was fueled by a number of significant factors, many of which continue to apply in 1992." (Compl. ¶ 17.) Behrendt then described the *increase* in sales to OEMs accounting for 46% of 1991 revenue, up from 39% the previous year. He

at 936 n. 1. I decline to do so here. In contrast to the above cases, this complaint deals with a numerous disclosures, not just one document or

several which were publicly filed, and the appendix provided by Defendants does not include all the referenced disclosures.

made no projections as to gross margins for 1992. Plaintiffs do not state why they believe this letter is misleading. Based on their consistent contention that the Defendants failed to disclose the trend toward decreasing sales to VARs, however, Behrendt did not misrepresent future sales patterns because he predicted this trend.

■ Although Defendants cannot be held liable for accurately reporting the historical data disclosed in the foregoing passages, the company did make some affirmative predictions in other areas of the Form 10–K, the annual report and the Form 10–Qs for the first and second quarter of 1992. The Form 10–K and the annual discussed the decline in gross margins for 1991. The company blamed this decline on the reduced selling price of the EXB–8200 and, to a lesser extent, the EXB–8500. These losses were only partially offset by savings in the production cost of the products. The company went on to forecast that it

> currently expects further reductions in the selling prices of both of these products during 1992. While the manufacturing cost per unit of the EXB–8200 is expected to remain fairly stable, the cost per unit of the EXB–8500 product is expected to decline mostly during 1992. While these factors are expected to result in lower gross margins for these products, the expected shift in product mix towards the higher margin EXB–8500, EXB–10 CHS and EXB–120 CHS products is expected to yield a gross margin for 1992 which is approximately equal to that of 1991.

(Compl. ¶ 18(a).) In the Form 10–Q for the first quarter of 1992, Exabyte again stated that the selling price for EXB–8200 and the EXB–8500 had fallen, which was only partially offset by savings in production costs. It tempered its prediction of future gross margins, however, stating: "On balance, these factors are expected to negatively affect gross margins for these products, but this may be substantially offset by the expected shift in mix towards the higher margin EXB–8500, EXB–10/101 CHS and EXB–120 CHS products." (Compl. ¶ 25(a).) Finally, in its Form 10–Q for the second quarter of 1992, Exabyte predicted that the shift in mix to the

EXB–8500 and related products would only "partially offset" the reduction in gross margins due to deteriorating sales prices of both the EXB–8200 and the EXB–8500. (See Compl. ¶ 27.)

As I noted above, a company is not required to make predictions of its future performance in SEC filings. If a company elects to do so, however, it can be held liable for securities fraud if those predictions were unreasonable or in bad faith. See 17 C.F.R. § 231.175 (1992) (forward-looking statements in SEC filings not fraudulent unless "made or reaffirmed without a reasonable basis or ... disclosed other than in good faith.") In *In re Apple Computer Securities Litigation,* 886 F.2d at 1113, the court defined the standards for determining whether a projection is fraudulent:

> A projection or statement of belief contains at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement. A projection or statement of belief may be actionable to the extent that one of these implied factual assertions is inaccurate.

Here, Plaintiffs allege a combination of the second and third factors: that Exabyte's projections of future gross margins were not reasonable because the Defendants either did not consider or failed to disclose that (a) "general economic conditions" would weaken the VAR and distributor markets, (see, e.g., Compl. ¶ 18(b)), and (b) the company had already made lower-margin sales of the EXB–8500 to OEMs, departing from its historical practice of selling to VARs first.

■ Plaintiffs' assertion that the Defendants engaged in fraud by not disclosing "general economic conditions" impacting the VAR and distributor markets is unavailing. The purpose of SEC disclosure requirements is to put the investor on an equal footing as insiders with respect to *internal* corporate information, not information otherwise available publicly. See *Acme Propane, Inc. v. Tenexco, Inc.,* 844 F.2d 1317, 1323 (7th Cir. 1988) ("The securities laws require the dis-

closure of information that is otherwise not in the public domain."); *In re Verifone Sec. Litig.*, 784 F.Supp. at 1481 ("shareholders and potential investors are most in need of 'hard' information such as sales and profit data, because such information is in the exclusive control of the corporation"); *In re Union Carbide Corp. Consumer Prods. Business Sec. Litigation*, 676 F.Supp. 458, 469 (S.D.N.Y.1987). Failure to disclose general economic trends, as opposed to firm-specific information, cannot form the basis for securities fraud, *see Wielgos v. Commonwealth Edison Co.*, 892 F.2d at 515; *Kowal v. MCI Communications Corp.*, No. 90–2862, 1992 WL 121378 at *7 (D.D.C. May 20, 1992) (dismissing case "where essentially the only allegation is that defendants failed to foresee an economic downturn resulting from general market conditions"), especially where it concerns trends in an entirely different industry sector, here the VAR and distributor markets. This is particularly true in a fraud-on-the-market case because the market price of a company's stock will reflect both the information the company disseminates and information bearing on the company's business that is already publicly available. *See In re Apple Computer Sec. Litig.*, 886 F.2d at 1114–15.

Plaintiffs' claims, therefore, rest on their contention that Defendants knew and failed to disclose the company's departure from its historical pattern of high initial sales to VARs and system integrators in the marketing cycle of the its new product lines. To support this contention, Plaintiffs allege that "initial sales of the Company's EXB–8505 product were shipped to IBM as an OEM customer throughout at least the third quarter 1992 (as a result of negotiations and agreements in place at the beginning of the Class period)." (Compl. ¶ 16(a)). Assuming this allegation to be true, as I must in considering this motion to dismiss, it proves nothing.

Plaintiffs cite no disclosure in which the company stated that it would first sell the EXB–8500 series only to VARs and system integrators. Nor did it conceal the fact that sales to the OEM market were becoming stronger in relation to sales to the VAR, distributor and system integrator market. Sales figures reported for fiscal years 1989 through 1990 illustrate this trend, and Defendant Behrendt disclosed it in his letter to shareholders. Instead, Exabyte's gross margin predictions in the Form 10–K, the annual report and the first and second quarter Form 10–Q's forecast that decreasing gross margins on the EXB–8200 and EXB–8500 would be offset by the expected shift in *product mix*, away from the lower-margin EXB–8200 product to the company's newer products, the EXB–8500, the EXB–10, and the EXB–120 CHS, not by increased sales of the EXB–8500 to VARs as opposed to OEMs. In other words, Exabyte predicted that it would sell more of its newer products in comparison to the EXB–8200 than it had in the past. Consequently, the focus must be on what Defendants knew about total sales of the EXB–8500 series as compared to sales of the older EXB–8200, not on the ratio of EXB–8500 sales between OEMs and VARs.

All Plaintiffs have alleged is that the company knew of the sale of the EXB–8505 to one OEM customer, IBM, during the class period. From this Plaintiffs would have me infer that such a sale (1) indicates a significant departure from the company's historical sales pattern, (2) shows a general weakness in sales to VARs, distributors and system integrators, and (3) should have indicated to the Defendants that total sales of the EXB–8500 would not meet expectations. These are not reasonable inferences. That the company was successful in selling the EXB–8500 to a large OEM during the early phases of its marketing, if anything, illustrates the strength of the product, since the OEM market is traditionally more skeptical about new technology. It is consistent with the company's sales projections favoring newer rather than older products. *Compare In re 3Com Sec. Litig.*, 761 F.Supp. 1411, 1415–16 (N.D.Cal.1990) (failure to disclose material *decline* in orders sufficient omission to show fraud). For these reasons, I conclude that Plaintiffs have failed to state a claim for securities fraud based on the company's SEC filings and the annual report.

Turning to the second form of disclosures cited in the complaint, disclosures made by

third-party securities analysts, the outcome is the same. Plaintiffs maintain that Defendants are liable because they provided information to these firms which guided their recommendations to buy the company's stock, and then "took no steps to cure the misleading impression conveyed by analysts' reports concerning the Company's prospects for 1992, including disclosure to the securities analysts of the trend with respect to Exabyte's new 8500 products of selling in the first instance to OEMs, rather than VARs and distributors, and the concomitant depressing effect on gross margins and earnings." (Compl. ¶ 24.)

When a company "places its imprimatur, expressly or impliedly, on ... analysts' projections," it may be held liable for securities fraud if it fails to correct false or misleading information relayed in those projections. *Alfus v. Pyramid Technology Corp.*, 764 F.Supp. 598, 603 (N.D.Cal.1991). Nevertheless, the company must possess information which would give it cause to correct the projections. *See In re Verifone Securities Litigation*, 784 F.Supp. at 1487. As I have discussed above, Plaintiffs fail to identify any reason why Defendants should have known that analysts' projections, which generally mirrored those made by the corporation, were inaccurate or misleading. They allege only that the Defendants knew the company had made sales of the EXB–8500 to OEMs early in the product's cycle, not that they possessed inside information showing that similar sales to VARs were weak. Therefore, even considering these third party disclosures, Plaintiffs' complaint fails to state a claim.

Finally, Plaintiffs request permission to amend their complaint. I fail to see how amendment will produce a legally sufficient complaint. After consolidation of the eight lawsuits comprising this litigation, Plaintiffs, represented by experienced and competent counsel, were given an adequate opportunity to file a new complaint setting forth their best theories in this case. That effort has failed. Given the high stakes in securities litigation, two bites at the apple are enough. *See id.* at 1486. Accordingly,

IT IS ORDERED THAT Defendants' motion to dismiss the complaint for failure to state a claim under Fed.R.Civ.P. 12(b)(6) is GRANTED with prejudice, and

IT IS FURTHER ORDERED THAT Plaintiffs' request for leave to amend the complaint is DENIED.