(Slip Opinion) OCTOBER TERM, 2012 1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## LOZMAN *v.* CITY OF RIVIERA BEACH, FLORIDA

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 11–626.  Argued October 1, 2012—Decided January 15, 2013

Petitioner Lozman's floating home was a house-like plywood structure with empty bilge space underneath the main floor to keep it afloat. He had it towed several times before deciding on a marina owned by the city of Riviera Beach (City).  After various disputes with Lozman and unsuccessful efforts to evict him from the marina, the City brought a federal admiralty lawsuit *in rem* against the floating home, seeking a lien for dockage fees and damages for trespass.  Lozman moved to dismiss the suit for lack of admiralty jurisdiction.  The District Court found the floating home to be a "vessel" under the Rules of Construction Act, which defines a "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water," 1  U. S. C. §3, concluded that admiralty jurisdiction was proper, and awarded the City dockage fees and nominal damages.  The Eleventh Circuit affirmed, agreeing that the home was a "vessel" since it was "capable" of movement over water despite petitioner's subjective intent to remain moored indefinitely.

*Held*:
    1. This case is not moot.  The District Court ordered the floating home sold, and the City purchased the home at auction and had it destroyed.  Before the sale, the court ordered the City to post a bond to ensure Lozman could obtain monetary relief if he prevailed.  P. 3.
    2. Lozman's floating home is not a §3 "vessel." Pp. 3–15.
      (a) The Eleventh Circuit found the home "capable of being used . . . as a means of transportation on water" because it could float and proceed under tow and its shore connections did not render it incapable of transportation.  This interpretation is too broad. The definition of "transportation," the conveyance of persons or things from one

place to another, must be applied in a practical way. *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 496. Consequently, a structure does not fall within the scope of the statutory phrase unless a reasonable observer, looking to the home's physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water. Pp. 3–5.

(b) But for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water. It had no steering mechanism, had an unraked hull and rectangular bottom 10 inches below the water, and had no capacity to generate or store electricity. It also lacked self-propulsion, differing significantly from an ordinary houseboat. Pp. 5–6.

(c) This view of the statute is consistent with its text, precedent, and relevant purposes. The statute's language, read naturally, lends itself to that interpretation: The term "contrivance" refers to something "employed in contriving to effect a purpose"; "craft" explains that purpose as "water carriage and transport"; the addition of "water" to "craft" emphasizes the point; and the words, "used, or capable of being used, as a means of transportation on water," drive the point home. Both *Evansville & Bowling Green Packet Co.* v. *Chero Cola Bottling Co.*, 271 U. S. 19, and *Stewart, supra*, support this conclusion. *Evansville* involved a wharfboat floated next to a dock, used to transfer cargo, and towed to harbor each winter; and *Stewart* involved a dredge used to remove silt from the ocean floor, which carried a captain and crew and could be navigated only by manipulating anchors and cables or by being towed. Water transportation was not the primary purpose of either structure; neither was in motion at relevant times; and both were sometimes attached to the ocean bottom or to land. However, *Stewart*'s dredge, which was regularly, but not primarily, used to transport workers and equipment over water, fell within the statutory definition while *Evansville*'s wharfboat, which was not designed to, and did not, serve a transportation function, did not. Lower court cases, on balance, also tend to support this conclusion. Further, the purposes of major federal maritime statutes—*e.g.*, admiralty provisions provide special attachment procedures lest a vessel avoid liability by sailing away, recognize that sailors face special perils at sea, and encourage shipowners to engage in port-related commerce—reveal little reason to classify floating homes as "vessels." Finally, this conclusion is consistent with state laws in States where floating home owners have congregated in communities. Pp. 6–11.

(d) Several important arguments made by the City and its *amici* are unavailing. They argue that a purpose-based test may introduce a subjective element into "vessel" determinations. But the Court has

Syllabus

considered only objective evidence, looking to the views of a reasonable observer and the physical attributes and behavior of the structure. They also argue against using criteria that are too abstract, complex, or open-ended. While this Court's approach is neither perfectly precise nor always determinative, it is workable and consistent and should offer guidance in a significant number of borderline cases. And contrary to the dissent's suggestion, the Court sees nothing to be gained by a remand. Pp. 11–14.

(e) The City's additional argument that Lozman's floating home was *actually* used for transportation over water is similarly unpersuasive. P. 14.

649 F. 3d 1259, reversed.

BREYER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, THOMAS, GINSBURG, ALITO, and KAGAN, JJ., joined. SOTOMAYOR, J., filed a dissenting opinion, in which KENNEDY, J., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 11–626

———————

## FANE LOZMAN, PETITIONER *v.* THE CITY OF RIVIERA BEACH, FLORIDA

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[January 15, 2013]

JUSTICE BREYER delivered the opinion of the Court.

The Rules of Construction Act defines a "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U. S. C. §3. The question before us is whether petitioner's floating home (which is not self-propelled) falls within the terms of that definition.

In answering that question we focus primarily upon the phrase "capable of being used." This term encompasses "practical" possibilities, not "merely . . . theoretical" ones. *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 496 (2005). We believe that a reasonable observer, looking to the home's physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water. And we consequently conclude that the floating home is not a "vessel."

I

In 2002 Fane Lozman, petitioner, bought a 60-foot by 12-foot floating home. App. 37, 71. The home consisted of a house-like plywood structure with French doors on three sides. *Id.*, at 38, 44. It contained a sitting room, bedroom,

closet, bathroom, and kitchen, along with a stairway leading to a second level with office space. *Id.*, at 45–66. An empty bilge space underneath the main floor kept it afloat. *Id.*, at 38. (See Appendix, *infra*, for a photograph.) After buying the floating home, Lozman had it towed about 200 miles to North Bay Village, Florida, where he moored it and then twice more had it towed between nearby marinas. In 2006 Lozman had the home towed a further 70 miles to a marina owned by the city of Riviera Beach (City), respondent, where he kept it docked. Brief for Respondent 5.

After various disputes with Lozman and unsuccessful efforts to evict him from the marina, the City brought this federal admiralty lawsuit *in rem* against the floating home. It sought a maritime lien for dockage fees and damages for trespass. See Federal Maritime Lien Act, 46 U. S. C. §31342 (authorizing federal maritime lien against vessel to collect debts owed for the provision of "necessaries to a vessel"); 28 U. S. C. §1333(1) (civil admiralty jurisdiction). See also *Leon* v. *Galceran*, 11 Wall. 185 (1871); *The Rock Island Bridge*, 6 Wall. 213, 215 (1867).

Lozman, acting *pro se,* asked the District Court to dismiss the suit on the ground that the court lacked admiralty jurisdiction. See 2 Record, Doc. 64. After summary judgment proceedings, the court found that the floating home was a "vessel" and concluded that admiralty jurisdiction was consequently proper. Pet. for Cert. 42a. The judge then conducted a bench trial on the merits and awarded the City $3,039.88 for dockage along with $1 in nominal damages for trespass. *Id.,* at 49a.

On appeal the Eleventh Circuit affirmed. *Riviera Beach* v. *That Certain Unnamed Gray, Two-Story Vessel Approximately Fifty-Seven Feet in Length*, 649 F. 3d 1259 (2011). It agreed with the District Court that the home was a "vessel." In its view, the home was "capable" of movement over water and the owner's subjective intent to remain

moored "indefinitely" at a dock could not show the contrary. *Id.,* at 1267–1269.

Lozman sought certiorari. In light of uncertainty among the Circuits about application of the term "capable" we granted his petition. Compare *De La Rosa* v. *St. Charles Gaming Co.,* 474 F. 3d 185, 187 (CA5 2006) (structure is not a "vessel" where "physically," but only "theoretical[ly]," "capable of sailing," and owner intends to moor it indefinitely as floating casino), with *Board of Comm'rs of Orleans Levee Dist.* v. *M/V Belle of Orleans*, 535 F. 3d 1299, 1311–1312 (CA11 2008) (structure is a "vessel" where capable of moving over water under tow, "albeit to her detriment," despite intent to moor indefinitely). See also 649 F. 3d, at 1267 (rejecting views of Circuits that "'focus on the intent of the shipowner'").

## II

At the outset we consider one threshold matter. The District Court ordered the floating home sold to satisfy the City's judgment. The City bought the home at public auction and subsequently had it destroyed. And, after the parties filed their merits briefs, we ordered further briefing on the question of mootness in light of the home's destruction. 567 U. S. \_\_\_ (2012). The parties now have pointed out that, prior to the home's sale, the District Court ordered the City to post a $25,000 bond "to secure Mr. Lozman's value in the vessel." 1 Record, Doc. 20, p. 2. The bond ensures that Lozman can obtain monetary relief if he ultimately prevails. We consequently agree with the parties that the case is not moot.

## III
### A

We focus primarily upon the statutory phrase "capable of being used . . . as a means of transportation on water." 1 U. S. C. §3. The Court of Appeals found that the home

was "capable" of transportation because it could float, it could proceed under tow, and its shore connections (power cable, water hose, rope lines) did not "'rende[r]'" it "'practically incapable of transportation or movement.'" 649 F. 3d, at 1266 (quoting *Belle of Orleans, supra,* at 1312, in turn quoting *Stewart,* 543 U. S., at 494). At least for argument's sake we agree with the Court of Appeals about the last-mentioned point, namely that Lozman's shore connections did not "'render'" the home "'practically incapable of transportation.'" But unlike the Eleventh Circuit, we do not find these considerations (even when combined with the home's other characteristics) sufficient to show that Lozman's home was a "vessel."

The Court of Appeals recognized that it had applied the term "capable" broadly. 649 F. 3d, at 1266. Indeed, it pointed with approval to language in an earlier case, *Burks* v. *American River Transp. Co.,* 679 F. 2d 69 (1982), in which the Fifth Circuit said:

> "'No doubt the three men in a tub would also fit within our definition, and one probably could make a convincing case for Jonah inside the whale.'" 649 F. 3d, at 1269 (brackets omitted) (quoting *Burks, supra,* at 75).

But the Eleventh Circuit's interpretation is too broad. Not *every* floating structure is a "vessel." To state the obvious, a wooden washtub, a plastic dishpan, a swimming platform on pontoons, a large fishing net, a door taken off its hinges, or Pinocchio (when inside the whale) are not "vessels," even if they are "artificial contrivance[s]" capable of floating, moving under tow, and incidentally carrying even a fair-sized item or two when they do so. Rather, the statute applies to an "artificial contrivance . . . capable of being used . . . *as a means of transportation on water.*" 1 U. S. C. §3 (emphasis added). "[T]ransportation" involves the "conveyance (of things or persons) from one place to

another." 18 Oxford English Dictionary 424 (2d ed. 1989) (OED). Accord, N. Webster, An American Dictionary of the English Language 1406 (C. Goodrich & N. Porter eds. 1873) ("[t]he act of transporting, carrying, or conveying from one place to another"). And we must apply this definition in a "practical," not a "theoretical," way. *Stewart, supra*, at 496. Consequently, in our view a structure does not fall within the scope of this statutory phrase unless a reasonable observer, looking to the home's physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water.

B

Though our criterion is general, the facts of this case illustrate more specifically what we have in mind. But for the fact that it floats, nothing about Lozman's home suggests that it was designed to any practical degree to transport persons or things over water. It had no rudder or other steering mechanism. 649 F. 3d*,* at 1269. Its hull was unraked, *ibid.*, and it had a rectangular bottom 10 inches below the water. Brief for Petitioner 27; App. 37. It had no special capacity to generate or store electricity but could obtain that utility only through ongoing connections with the land. *Id.*, at 40. Its small rooms looked like ordinary nonmaritime living quarters. And those inside those rooms looked out upon the world, not through watertight portholes, but through French doors or ordinary windows. *Id.*, at 44–66.

Although lack of self-propulsion is not dispositive, *e.g., The Robert W. Parsons*, 191 U. S. 17, 31 (1903), it may be a relevant physical characteristic. And Lozman's home differs significantly from an ordinary houseboat in that it has no ability to propel itself. Cf. 33 CFR §173.3 (2012) ("Houseboat means a *motorized* vessel . . . designed primarily for multi-purpose accommodation spaces with low

freeboard and little or no foredeck or cockpit" (emphasis
added)).   Lozman's home was able to travel over water
only by being towed.  Prior to its arrest, that home's travel
by tow over water took place on only four occasions over a
period of seven years.  *Supra,* at 2.  And when the home
was towed a significant distance in 2006, the towing com-
pany had a second boat follow behind to prevent the home
from swinging dangerously from side to side.  App. 104.

The home has no other feature that might suggest a
design to transport over water anything other than its
own furnishings and related personal effects.  In a word,
we can find nothing about the home that could lead a
reasonable observer to consider it designed to a practical
degree for "transportation on water."

C

Our view of the statute is consistent with its text, prece-
dent, and relevant purposes.  For one thing, the statute's
language, read naturally, lends itself to that interpreta-
tion.  We concede that the statute uses the word "every,"
referring to "*every* description of watercraft or other artifi-
cial contrivance."  1 U. S. C. §3 (emphasis added).  But
the term "contrivance" refers to "something contrived for,
or employed in contriving to effect a purpose."  3 OED 850
(def. 7).  The term "craft" explains that purpose as "water
carriage and transport."  *Id.,* at 1104 (def. V(9)(b)) (de-
fining "craft" as a "vesse[l] . . . for" that purpose).  The ad-
dition of the word "water" to "craft," yielding the term
"watercraft," emphasizes the point.  And the next few words,
"used, or capable of being used, as a means of transporta-
tion on water," drive the point home.

For another thing, the bulk of precedent supports our
conclusion.  In *Evansville & Bowling Green Packet Co.* v.
*Chero Cola Bottling Co.*, 271 U. S. 19 (1926), the Court
held that a wharfboat was *not* a "vessel."  The wharfboat
floated next to a dock; it was used to transfer cargo from

ship to dock and ship to ship; and it was connected to the dock with cables, utility lines, and a ramp. *Id.,* at 21. At the same time, it was capable of being towed. And it was towed each winter to a harbor to avoid river ice. *Id.,* at 20–21. The Court reasoned that, despite the annual movement under tow, the wharfboat "was not used to carry freight from one place to another," nor did it "encounter perils of navigation to which craft used for transportation are exposed." *Id.,* at 22. (See Appendix, *infra*, for photograph of a period wharfboat).

The Court's reasoning in *Stewart* also supports our conclusion. We there considered the application of the statutory definition to a dredge. 543 U. S., at 494. The dredge was "a massive floating platform" from which a suspended clamshell bucket would "remov[e] silt from the ocean floor," depositing it "onto one of two scows" floating alongside the dredge. *Id.,* at 484. Like more traditional "seagoing vessels," the dredge had, *e.g.*, "a captain and crew, navigational lights, ballast tanks, and a crew dining area." *Ibid.* Unlike more ordinary vessels, it could navigate only by "manipulating its anchors and cables" or by being towed. *Ibid.* Nonetheless it did move. In fact it moved over water "every couple of hours." *Id.,* at 485.

We held that the dredge was a "vessel." We wrote that §3's definition "merely codified the meaning that the term 'vessel' had acquired in general maritime law." *Id.,* at 490. We added that the question of the "watercraft's use 'as a means of transportation on water' is . . . practical," and not "merely . . . theoretical." *Id.,* at 496. And we pointed to cases holding that dredges ordinarily "served a waterborne transportation function," namely that "in performing their work they carried machinery, equipment, and crew over water." *Id.,* at 491–492 (citing, *e.g., Butler* v. *Ellis*, 45 F. 2d 951, 955 (CA4 1930)).

As the Court of Appeals pointed out, in *Stewart* we also wrote that §3 "does not require that a watercraft be used

*primarily* for that [transportation] purpose," 543 U. S., at 495; that a "watercraft need not be in motion to qualify as a vessel," *ibid.*; and that a structure may qualify as a vessel even if attached—but not "permanently" attached—to the land or ocean floor. *Id.,* at 493–494. We did not take these statements, however, as implying a universal set of sufficient conditions for application of the definition. Rather, they say, and they mean, that the statutory definition *may* (or may not) apply—not that it *automatically must* apply—where a structure has some other *primary* purpose, where it is stationary at relevant times, and where it is attached—but not permanently attached—to land.

After all, a washtub is normally not a "vessel" though it does not have water transportation as its primary purpose, it may be stationary much of the time, and it might be attached—but not permanently attached—to land. More to the point, water transportation was not the *primary purpose* of either *Stewart'*s dredge or *Evansville'*s wharfboat; neither structure was "in motion" at relevant times; and both were sometimes attached (though not permanently attached) to the ocean bottom or to land. Nonetheless *Stewart'*s dredge fell within the statute's definition while *Evansville'*s wharfboat did not.

The basic difference, we believe, is that the dredge was regularly, but not primarily, used (and designed in part to be used) to transport workers and equipment over water while the wharfboat was not designed (to any practical degree) to serve a transportation function and did not do so. Compare *Cope* v. *Vallette Dry Dock Co.*, 119 U. S. 625 (1887) (floating drydock not a "vessel" because permanently fixed to wharf), with *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U. S. 527, 535 (1995) (barge sometimes attached to river bottom to use as a work platform remains a "vessel" when "at other times it was used for transportation"). See also *ibid.* (citing *Great Lakes*

*Dredge & Dock Co.* v. *Chicago*, 3 F. 3d 225, 229 (CA7 1993)
("[A] craft is a 'vessel' if its purpose is to some reasonable
degree 'the transportation of passengers, cargo, or equip-
ment from place to place across navigable waters'")); *Cope*,
*supra*, at 630 (describing "hopper-barge," as potentially
a "vessel" because it is a "navigable structure[,] used for
the purpose of transportation"); cf. 1 Benedict on Admiralty
§164, p. 10–6 (7th rev. ed. 2012) (maritime jurisdiction
proper if "the craft is a navigable structure intended for
maritime transportation").

Lower court cases also tend, on balance, to support our
conclusion. See, *e.g.*, *Bernard* v. *Binnings Constr. Co.*, 741
F. 2d 824, 828, n. 13, 832, n. 25 (CA5 1984) (work punt
lacking features objectively indicating a transportation
function not a "vessel," for "our decisions make clear that
the mere capacity to float or move across navigable waters
does not necessarily make a structure a vessel"); *Rud-
diman* v. *A Scow Platform*, 38 F. 158 (SDNY 1889) (scow,
though "capable of being towed . . . though not without
some difficulty, from its clumsy structure" just a floating
box, not a "vessel," because "it was not designed or used
for the purpose of navigation," not engaged "in the trans-
portation of persons or cargo," and had "no motive power,
no rudder, no sails"). See also 1 T. Schoenbaum, Admi-
ralty and Maritime Law §3–6, p. 155 (5th ed. 2011) (courts
have found that "floating dry-dock[s]," "floating platforms,
barges, or rafts used for construction or repair of piers,
docks, bridges, pipelines and other" similar facilities are
not "vessels"); E. Benedict, American Admiralty §215,
p. 116 (3d rev. ed. 1898) (defining "vessel" as a "'machine
adapted to transportation over rivers, seas, and oceans'").

We recognize that some lower court opinions can be read
as endorsing the "anything that floats" approach. See
*Miami River Boat Yard, Inc.* v. *60' Houseboat*, 390 F. 2d
596, 597 (CA5 1968) (so-called "houseboat" lacking self-
propulsion); *Sea Village Marina, LLC* v. *A 1980 Carlcraft*

*Houseboat*, No. 09–3292, 2009 WL 3379923, *5–*6 (D NJ, Oct. 19, 2009) (following *Miami River Boat Yard*); *Hudson Harbor 79th Street Boat Basin, Inc.* v. *Sea Casa*, 469 F. Supp. 987, 989 (SDNY 1979) (same). Cf. *Holmes* v. *Atlantic Sounding Co.*, 437 F. 3d 441 (CA5 2006) (floating dormitory); *Summerlin* v. *Massman Constr. Co.*, 199 F. 2d 715 (CA4 1952) (derrick anchored in the river engaged in building a bridge is a vessel). For the reasons we have stated, we find such an approach inappropriate and inconsistent with our precedents.

Further, our examination of the purposes of major federal maritime statutes reveals little reason to classify floating homes as "vessels." Admiralty law, for example, provides special attachment procedures lest a vessel avoid liability by sailing away. 46 U. S. C. §§31341–31343 (2006 ed. and Supp. IV). Liability statutes such as the Jones Act recognize that sailors face the special "'perils of the sea.'" *Chandris, Inc.* v. *Latsis*, 515 U. S. 347, 354, 373 (1995) (referring to "'vessel[s] in navigation'"). Certain admiralty tort doctrines can encourage shipowners to engage in port-related commerce. *E.g.*, 46 U. S. C. §30505; *Executive Jet Aviation, Inc.* v. *Cleveland*, 409 U. S. 249, 269–270 (1972). And maritime safety statutes subject vessels to U. S. Coast Guard inspections. *E.g.*, 46 U. S. C. §3301.

Lozman, however, cannot easily escape liability by sailing away in his home. He faces no special sea dangers. He does not significantly engage in port-related commerce. And the Solicitor General tells us that to adopt a version of the "anything that floats" test would place unnecessary and undesirable inspection burdens upon the Coast Guard. Brief for United States as *Amicus Curiae* 29, n. 11.

Finally, our conclusion is consistent with state laws in States where floating home owners have congregated in communities. See Brief for Seattle Floating Homes Association et al. as *Amici Curiae* 1. A Washington State

environmental statute, for example, defines a floating home (for regulatory purposes) as "a single-family dwelling unit constructed on a float, that is moored, anchored, or otherwise secured in waters, and is not a vessel, even though it may be capable of being towed." Wash. Rev. Code Ann. §90.58.270(5)(b)(ii) (Supp. 2012). A California statute defines a floating home (for tax purposes) as "a floating structure" that is "designed and built to be used, or is modified to be used, as a stationary waterborne residential dwelling," and which (unlike a typical houseboat), has no independent power generation, and is dependent on shore utilities. Cal. Health & Safety Code Ann. §18075.55(d) (West 2006). These States, we are told, treat structures that meet their "floating home" definitions like ordinary land-based homes rather than like vessels. Brief for Seattle Floating Homes Association 2. Consistency of interpretation of related state and federal laws is a virtue in that it helps to create simplicity making the law easier to understand and to follow for lawyers and for nonlawyers alike. And that consideration here supports our conclusion.

## D

The City and supporting *amici* make several important arguments that warrant our response. First, they argue against use of any purpose-based test lest we introduce into "vessel" determinations a subjective element—namely, the owner's intent. That element, they say, is often "unverifiable" and too easily manipulated. Its introduction would "foment unpredictability and invite gamesmanship." Brief for Respondent 33.

We agree with the City about the need to eliminate the consideration of evidence of subjective intent. But we cannot agree that the need requires abandonment of all criteria based on "purpose." Cf. *Stewart*, 543 U. S., at 495 (discussing transportation purpose). Indeed, it is difficult,

if not impossible, to determine the use of a human "contrivance" without some consideration of human purposes. At the same time, we have sought to avoid subjective elements, such as owner's intent, by permitting consideration only of objective evidence of a waterborne transportation purpose. That is why we have referred to the views of a reasonable observer. *Supra,* at 1. And it is why we have looked to the physical attributes and behavior of the structure, as objective manifestations of any relevant purpose, and not to the subjective intent of the owner. *Supra,* at 5–6. We note that various admiralty treatises refer to the use of purpose-based tests without any suggestion that administration of those tests has introduced too much subjectivity into the vessel-determination process. 1 Benedict on Admiralty §164; 1 Admiralty and Maritime Law §3–6.

Second, the City, with support of *amici*, argues against the use of criteria that are too abstract, complex, or open-ended. Brief for Respondent 28–29. A court's jurisdiction, *e.g.*, admiralty jurisdiction, may turn on application of the term "vessel." And jurisdictional tests, often applied at the outset of a case, should be "as simple as possible." *Hertz Corp.* v. *Friend,* 559 U. S. ___, ___ (2010) (slip op., at 1).

We agree with the last-mentioned sentiment. And we also understand that our approach is neither perfectly precise nor always determinative. Satisfaction of a design-based or purpose-related criterion, for example, is not always sufficient for application of the statutory word "vessel." A craft whose physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a nonvessel by later physical alterations. For example, an owner might take a structure that is otherwise a vessel (even the *Queen Mary)* and connect it permanently to the land for use, say, as a hotel. See *Stewart, supra,* at 493–494. Further,

changes over time may produce a new form, *i.e.*, a newly designed structure—in which case it may be the new design that is relevant. See *Kathriner* v. *Unisea, Inc.*, 975 F. 2d 657, 660 (CA9 1992) (floating processing plant was no longer a vessel where a "large opening [had been] cut into her hull").

Nor is satisfaction of the criterion always a necessary condition, see Part IV, *infra*. It is conceivable that an owner might *actually use* a floating structure not designed to any practical degree for transportation as, say, a ferry boat, regularly transporting goods and persons over water.

Nonetheless, we believe the criterion we have used, taken together with our example of its application here, should offer guidance in a significant number of borderline cases where "capacity" to transport over water is in doubt. Moreover, borderline cases will always exist; they require a method for resolution; we believe the method we have used is workable; and, unlike, say, an "anything that floats" test, it is consistent with statutory text, purpose, and precedent. Nor do we believe that the dissent's approach would prove any more workable. For example, the dissent suggests a relevant distinction between an owner's "clothes and personal effects" and "large appliances (like an oven or a refrigerator)." *Post,* at 8 (opinion of SOTOMAYOR, J.). But a transportation function need not turn on the size of the items in question, and we believe the line between items being transported from place to place (*e.g.*, cargo) and items that are mere appurtenances is the one more likely to be relevant. Cf. Benedict, American Admiralty §222, at 121 ("A ship is usually described as consisting of the ship, her tackle, apparel, and furniture . . .").

Finally, the dissent and the Solicitor General (as *amicus* for Lozman) argue that a remand is warranted for further factfinding. See *post*, at 10–12; Brief for United States as *Amicus Curiae* 29–31. But neither the City nor Lozman

makes such a request. Brief for Respondent 18, 49, 52. And the only potentially relevant factual dispute the dissent points to is that the home suffered serious damage during a tow. *Post*, at 10–11. But this would add support to our ultimate conclusion that this floating home was not a vessel. We consequently see nothing to be gained by a remand.

## IV

Although we have focused on the phrase "*capable* of being used" for transportation over water, the statute also includes as a "vessel" a structure that is *actually* "used" for that transportation. 1 U. S. C. §3 (emphasis added). And the City argues that, irrespective of its design, Lozman's floating home was *actually* so used. Brief for Respondent 32. We are not persuaded by its argument.

We are willing to assume for argument's sake that sometimes it is possible actually to use for water transportation a structure that is in no practical way designed for that purpose. See *supra,* at 12–13. But even so, the City cannot show the actual use for which it argues. Lozman's floating home moved only under tow. Before its arrest, it moved significant distances only twice in seven years. And when it moved, it carried, not passengers or cargo, but at the very most (giving the benefit of any factual ambiguity to the City) only its own furnishings, its owner's personal effects, and personnel present to assure the home's safety. 649 F. 3d, at 1268; Brief for Respondent 32; Tr. of Oral Arg. 37–38. This is far too little *actual* "use" to bring the floating home within the terms of the statute. See *Evansville,* 271 U. S., at 20–21 (wharfboat not a "vessel" even though "[e]ach winter" it "was towed to [a] harbor to protect it from ice"); see also *Roper* v. *United States*, 368 U. S. 20, 23 (1961) ("Unlike a barge, the S. S. *Harry Lane* was not moved in order to transport commodities from one location to another"). See also *supra*, at 6–11.

Opinion of the Court

## V

For these reasons, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

APPENDIX



Petitioner's floating home.  App. 69.

Appendix to opinion of the Court



50- by 200-foot wharf boat in Evansville, Indiana, on Nov. 13, 1918. H. R. Doc. No. 1521, 65th Cong., 3d Sess., Illustration No. 13 (1918).

# SUPREME COURT OF THE UNITED STATES

———

No. 11–626

———

## FANE LOZMAN, PETITIONER *v.* THE CITY OF RIVIERA BEACH, FLORIDA

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE ELEVENTH CIRCUIT

[January 15, 2013]

JUSTICE SOTOMAYOR, with whom JUSTICE KENNEDY joins, dissenting.

I agree with much of the Court's reasoning. Our precedents fully support the Court's reasoning that the Eleventh Circuit's test is overinclusive; that the subjective intentions of a watercraft's owner or designer play no role in the vessel analysis of 1 U. S. C. §3; and that an objective assessment of a watercraft's purpose or function governs whether that structure is a vessel. The Court, however, creates a novel and unnecessary "reasonable observer" reformulation of these principles and errs in its determination, under this new standard, that the craft before us is not a vessel. Given the underdeveloped record below, we should remand. Therefore, I respectfully dissent.

I

The relevant statute, 1 U. S. C. §3, "sweeps broadly." *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 494 (2005). It provides that "[t]he word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." This broad phrasing flows from admiralty law's long recognition that vessels come in many shapes and sizes. See E. Benedict, American Admiralty §218, p. 121

(1870 ed.) ("[V]essel, is a general word, many times used for any kind of navigation"); M. Cohen, Admiralty Jurisdiction, Law, and Practice 232 (1883) ("[T]he term 'vessel' shall be understood to comprehend every description of vessel navigating on any sea or channel, lake or river . . . ").

Our test for vessel status has remained the same for decades: "Under §3, a 'vessel' is any watercraft practically capable of maritime transportation . . . ." *Stewart*, 543 U. S., at 497; see also *Evansville & Bowling Green Packet Co.* v. *Chero Cola Bottling Co.*, 271 U. S. 19, 22 (1926); *Cope* v. *Vallette Dry Dock Co.*, 119 U. S. 625, 627 (1887). At its core, vessel status has always rested upon the objective physical characteristics of a vessel (such as its structure, shape, and materials of construction), as well as its usage history. But over time, several important principles have guided both this Court and the lower courts in determining what kinds of watercraft fall properly within the scope of admiralty jurisdiction.

Consider the most basic of requirements. For a watercraft to be "practically capable" of maritime transportation, it must first be "capable" of such transportation. Only those structures that can simultaneously float and carry people or things over water are even presumptively within §3's reach. Stopping here, as the Eleventh Circuit essentially did, results in an overinclusive test. Section 3, after all, does not drag every bit of floating and towable flotsam and jetsam into admiralty jurisdiction. Rather, the terms "capable of being used" and "practical" have real significance in our maritime jurisprudence.

"[A] water craft is not 'capable of being used' for maritime transport in any meaningful sense if it has been permanently moored." *Stewart*, 543 U. S., at 494. So, to take an obvious example, a floating bridge over water does not constitute a vessel; such mooring is clearly permanent. Cf. *The Rock Island Bridge*, 6 Wall. 213, 216 (1867). Less

dramatically, a watercraft whose objective physical con-
nections to land "evidence a permanent location" does not
fall within §3's ambit. See, *e.g., Evansville*, 271 U. S., at
22 ("[The wharfboat] served at Evansville as an office,
warehouse and wharf, and was not taken from place to
place. The connections with the water, electric light and
telephone systems of the city evidence a permanent loca-
tion"); *Dunklin* v. *Louisiana Riverboat Gaming Partner-
ship*, No. 00–31455, 2001 WL 650209, *1, n. 1 (CA5, May
22, 2001) (*per curiam*) (describing a fully functional ca-
sino boat placed "in an enclosed pond in a cofferdam"). Put
plainly, structures "permanently affixed to shore or rest-
ing on the ocean floor," *Stewart*, 543 U. S., at 493–494,
have never been treated as vessels for the purposes of §3.

Our precedents have also excluded from vessel status
those watercraft "rendered practically incapable of trans-
portation or movement." *Id.*, at 494. Take the easiest
case, a vessel whose physical characteristics have been so
altered as to make waterborne transportation a practical
impossibility. *Ibid.* (explaining that a "floating processing
plant was no longer a vessel where a 'large opening [had
been] cut into her hull,' rendering her incapable of moving
over the water" (quoting *Kathriner* v. *UNISEA, Inc.*, 975
F. 2d 657, 660 (CA9 1992)). The longstanding admiralty
exception for "dead ships," those watercraft that "require
a major overhaul" for their "reactivation," also falls into
this category. See *Roper* v. *United States*, 368 U. S. 20, 21
(1961) (finding that a liberty ship "deactivated from ser-
vice and 'mothballed' " is not a "vessel in navigation"); see
generally Rutherglen, Dead Ships, 30 J. Maritime L. &
Comm. 677 (1999).[1] Likewise, ships that "have been

————————
[1] The converse category of ships "not yet born" is another historical
exclusion from vessel status. See *Tucker* v. *Alexandroff*, 183 U. S. 424,
438 (1902) ("A ship is born when she is launched, and lives so long as
her identity is preserved. Prior to her launching she is a mere conge-
ries of wood and iron—an ordinary piece of personal property—as

withdrawn from the water for extended periods of time" in order to facilitate repairs and reconstruction may lose their status as vessels until they are rendered capable of maritime transport. *Stewart*, 543 U. S., at 496. Cf. *West* v. *United States*, 361 U. S. 118, 120, 122 (1959) (noting that "the *Mary Austin* was withdrawn from any operation whatever while in storage with the 'moth-ball fleet' " and that "[t]he *Mary Austin*, as anyone could see, was not in maritime service. She was undergoing major repairs and complete renovation . . . ").

Finally, our maritime jurisprudence excludes from vessel status those floating structures that, based on their physical characteristics, do not "transport people, freight, or cargo from place to place" as one of their purposes. *Stewart*, 543 U. S., at 493. "Purpose," in this context, is determined solely by an objective inquiry into a craft's function. "[N]either size, form, equipment nor means of propulsion are determinative factors upon the question of [vessel status]," though all may be considered. *The Robert W. Parsons*, 191 U. S. 17, 30 (1903). Moreover, in assessing a particular structure's function, we have consistently examined its past and present activities. *Stewart*, 543 U. S., at 495; *Cope*, 119 U. S., at 627. Of course, a seaborne craft is not excluded from vessel status simply because its "primary purpose" is not maritime transport. *Stewart*, 543 U. S., at 497. We held as much in *Stewart* when we concluded that a dredge was a vessel notwithstanding that its "primary purpose" was "dredging rather than transportation." *Id.,* at 486, 495. So long as one purpose of a craft is transportation, whether of cargo or people or both, §3's practical capability requirement is satisfied.

Certainly, difficult and marginal cases will arise. For-

---

distinctly a land structure as a house, and subject only to mechanics' liens created by state law and enforceable in the state courts").

tunately, courts do not consider each floating structure anew. So, for example, when we were confronted in *Stewart* with the question whether a dredge is a §3 vessel, we did not commence with a clean slate; we instead sought guidance from previous cases that had confronted similar structures. See *id.*, at 490, and n. 5; see also *Norton* v. *Warner Co.*, 321 U. S. 565, 571–572 (1944) (likewise surveying earlier cases).

In sum, our precedents offer substantial guidance for how objectively to determine whether a watercraft is practically capable of maritime transport and thus qualifies as a §3 vessel. First, the capacity to float and carry things or people is an obvious prerequisite to vessel status. Second, structures or ships that are permanently moored or fixed in place are not §3 vessels. Likewise, structures that are practically incapable of maritime transport are not vessels, whether they are ships that have been altered so that they may no longer be put to sea, dead ships, or ships removed from navigation for extended periods of time. Third, those watercraft whose physical characteristics and usage history reveal no maritime transport purpose or use are not §3 vessels.

## II

The majority does not appear to disavow the legal principles described above. The majority apparently accepts that permanent mooring suffices to take a ship out of vessel status, *ante,* at 8, 12,[2] and that "[a] craft whose

───────────

[2] In discussing permanent mooring, as well as *Stewart*'s rejection of primary-purpose and state-of-transit tests for vessel status, *Stewart* v. *Dutra Constr. Co.*, 543 U. S. 481, 495 (2005), the majority states that our holdings "say, and they mean, that the statutory definition [given by §3] *may* (or may not) apply—not that it *automatically must* apply—where a structure has some other *primary* purpose, where it is stationary at relevant times, and where it is attached—but not permanently attached—to land." *Ante,* at 8. This must mean, by negative implication, that a permanently moored structure never falls within §3's

physical characteristics and activities objectively evidence a waterborne transportation purpose or function may still be rendered a nonvessel by later physical alterations," *ante,* at 12–13.[3]  No one argues that Lozman's craft was permanently moored, see App. 32 (describing the "deteriorated" ropes holding the craft in place), or that it had undergone physical alterations sufficient to take it out of vessel status, see Tr. of Oral Arg. 13 (Lozman's counsel arguing that the craft was never a vessel in the first place).  Our precedents make clear that the Eleventh Circuit's "anything that floats" test is overinclusive and ignores that purpose is a crucial factor in determining whether a particular craft is or is not a vessel.  Accordingly, the majority is correct that determining whether Lozman's craft is a vessel hinges on whether that craft had any maritime transportation purpose or function.

The majority errs, though, in concluding that the purpose component of the §3 test is whether "a reasonable observer, looking to the [craft]'s physical characteristics and activities, would not consider it to be designed to any practical degree for carrying people or things on water." *Ante,* at 1.  This phrasing has never appeared in any of our cases and the majority's use of it, despite its seemingly objective gloss, effectively (and erroneously) introduces a subjective component into the vessel-status inquiry.

For one thing, in applying this test the majority points to some characteristics of Lozman's craft that have no relationship to maritime transport, such as the style of the craft's rooms or that "those inside those rooms looked out upon the world, not through water-tight portholes, but

_____

definition.
    [3] Presumably, this encompasses those kinds of ships "otherwise rendered practically incapable of transportation or movement."  *Stewart*, 543 U. S., at 494.  That is, ships which have been altered so they cannot travel the seas, dead ships, and ships removed from the water for an extended period of time.  *Supra,* at 3–4.

through French doors or ordinary windows." *Ante,* at 5. The majority never explains why it believes these particular esthetic elements are important for determining vessel status. In fact, they are not. Section 3 is focused on whether a structure is "used, or capable of being used, as a means of transportation on water." By importing windows, doors, room style, and other esthetic criteria into the §3 analysis, the majority gives our vessel test an "I know it when I see it" flavor. *Jacobellis* v. *Ohio,* 378 U. S. 184, 197 (1964) (Stewart, J., concurring). But that has never been nor should it be the test: A badly designed and unattractive vessel is different from a structure that lacks any "practical capacity" for maritime transport. In the majority's eyes, the two appear to be one and the same.

The majority's treatment of the craft's past voyages is also strange. The majority notes that Lozman's craft could be and was, in fact, towed over long distances, including over 200 miles at one point. *Ante,* at 2–6. But the majority determines that, given the design of Lozman's craft, this is "far too little *actual* 'use' to bring the floating home within the terms of the statute." *Ante,* at 14. This is because "when it moved, it carried, not passengers or cargo, but at the very most (giving the benefit of any factual ambiguity to the City) only its own furnishings, its owner's personal effects, and personnel present to assure the home's safety." *Ante,* at 13–14.

I find this analysis confusing. The majority accepts that the record indicates that Lozman's craft traveled hundreds of miles while "carrying people or things." *Ante,* at 1. But then, in the same breath, the majority concludes that a "reasonable observer" would nonetheless conclude that the craft was not "designed to any practical degree for carrying people or things on water." *Ibid.* The majority fails to explain how a craft that apparently did carry people and things over water for long distances was not "practically capable" of maritime transport.

This is not to say that a structure capable of such feats is necessarily a vessel. A craft like Lozman's might not be a vessel, for example, if it could only carry its owner's clothes and personal effects, or if it is only capable of transporting itself and its appurtenances. *Jerome B. Grubart, Inc.* v. *Great Lakes Dredge & Dock Co.*, 513 U. S. 527, 535 (1995) ("[M]aritime law . . . ordinarily treats an 'appurtenance' attached to a vessel in navigable waters as part of the vessel itself"). But if such a craft can carry large appliances (like an oven or a refrigerator) and all of the other things we might find in a normal home in addition to the occupants of that home, as the existing record suggests Lozman's craft may have done, then it would seem to be much more like a mobile home (and therefore a vessel) than a firmly rooted residence. The simple truth is that we know very little about the craft's capabilities and what did or did not happen on its various trips. By focusing on the little we do know for certain about this craft (*i.e.,* its windows, doors, and the style of its rooms) in determining whether it is a vessel, the majority renders the §3 inquiry opaque and unpredictable.

Indeed, the little we do know about Lozman's craft suggests only that it was an unusual structure. A surveyor was unable to find any comparable craft for sale in the State of Florida. App. 43. Lozman's home was neither obviously a houseboat, as the majority describes such ships, *ante,* at 5–6, nor clearly a floating home, *ante,* at 10–11. See App. 13, 31, 79 (sale, lease, and surveying documents describing Lozman's craft as a "houseboat"). The only clear difference that the majority identifies between these two kinds of structures is that the former are self-propelled, while the latter are not. *Ante,* at 5–6. But even the majority recognizes that self-propulsion has never been a prerequisite for vessel status. *Ante,* at 5 (citing *The Robert W. Parsons*, 191 U. S., at 31); see *Norton*, 321 U. S., at 571. Consequently, it is unclear why

Lozman's craft is a floating home, why all floating homes are not vessels,[4] or why Lozman's craft is not a vessel. If windows, doors, and other esthetic attributes are what take Lozman's craft out of vessel status, then the majority's test is completely malleable. If it is the craft's lack of self-propulsion, then the majority's test is unfaithful to our longstanding precedents. See *The Robert W. Parsons*, 191 U. S., at 30–31. If it is something else, then that something is not apparent from the majority's opinion.

Worse still, in straining to find that Lozman's craft was a floating home and therefore not a vessel, the majority calls into question the conclusions of numerous lower courts that have found houseboats that lacked self-propulsion to be §3 vessels. See *ante,* at 9–10 (citing *Miami River Boat Yard, Inc.* v. *60' Houseboat*, 390 F. 2d 596, 597 (CA5 1968); *Sea Village Marina, LLC* v. *A 1980 Carlcraft Houseboat*, No. 09–3292, 2009 WL 3379923, *5–*6 (D NJ, Oct. 19, 2009); *Hudson Harbor 79th Street Boat Basin, Inc.* v. *Sea Casa*, 469 F. Supp. 987, 989 (SDNY 1979)). The majority incorrectly suggests that these cases applied an " 'anything that floats' " test. *Ante,* at 9. These cases suggest something different. Many of these decisions in assessing the crafts before them looked carefully at these crafts' structure and function, and determined that these ships had capabilities similar to other long-established vessels, suggesting a significant maritime

——————

[4] To be clear, some floating homes are obviously not vessels. For example, some floating homes are structures built upon a large inverted pyramid of logs. Brief for Seattle Floating Homes Assn. et al. as *Amici Curiae* 14. Cf. App. 38 (Lozman's craft was buoyed by an empty bilge space). These kinds of floating homes can measure 4,000 or 5,000 square feet, see Brief for Seattle Floating Homes Assn. et al. as *Amici Curiae* 4, and may have connections to land that require the aid of divers and electricians to remove, *ibid.* These large, immobile structures are not vessels and have physical attributes directly connected to their lack of navigational abilities that suggest as much. But these structures are not before us; Lozman's craft is.

transportation function. See *Miami River Boat Yard*, 390
F. 2d, at 597 (likening houseboat at issue to a "barg[e]");
*Sea Village Marina*, 2009 WL 3379923, *7 ("According to
the available evidence, [the houseboats in question] float
and can be towed to a new marina without substantial
effort . . . "); *Hudson Harbor*, 469 F. Supp., at 989 (house-
boat "was capable of being used at least to the extent that
a 'dumb barge' is capable of being used" and comparable
to a "yach[t]"). Their holdings are consistent with older
cases, see, *e.g., The Ark*, 17 F. 2d 446, 447 (SD Fla. 1926),
and the crafts at issue in these cases have been widely
accepted as vessels by most treatises in this area, see 1 S.
Friedell, Benedict on Admiralty §164, p. 10–6, n. 2 (7th ed.
rev. 2012); 1 T. Schoenbaum, Admiralty & Maritime Law
§3–6, p. 153, n. 10 (5th ed. 2011); 1 R. Force & M. Norris,
The Law of Seamen §2:12, p. 2–82 (5th ed. 2003). The
majority's suggestion that rejecting the Eleventh Circuit's
test necessitates jettisoning these other precedents is
simply wrong. And, in its rejection, the majority works
real damage to what has long been a settled area of mari-
time law.[5]

## III

With a more developed record, Lozman's craft might be
distinguished from the houseboats in those lower court

———————

[5] The majority's invocation of two state environmental and tax stat-
utes as a reason to reject this well-established lower court precedent
is particularly misguided. See *ante,* at 10–11. We have repeatedly
emphasized that the "regulation of maritime vessels" is a "uniquely
*federal* are[a] of regulation." *Chamber of Commerce of United States
of America* v. *Whiting*, 563 U. S. __, __ (2011) (plurality opinion) (slip op.,
at 19) (emphasis added); see also *United States* v. *Locke*, 529 U. S. 89,
99 (2000) (explaining that "the federal interest [in regulating interstate
navigation] has been manifest since the beginning of our Republic and
is now well established"). Our previous cases did not turn to state law
in determining whether a given craft is a vessel. There are no good
reasons to do so now.

cases just discussed. For example, if Lozman's craft's previous voyages caused it serious damage, then that would strongly suggest that it lacked a maritime transportation purpose or function. There is no harm in remanding the case for further factfinding along the lines described above, cautioning the lower courts to be aware that features of Lozman's "incomparable" craft, see App. 43, may distinguish it from previous precedents. At most, such a remand would introduce a relatively short delay before finally ending the years-long battle between Lozman and the city of Riviera Beach.

On the other hand, there is great harm in stretching the facts below and overriding settled and likely correct lower court precedents to reach the unnecessary conclusion that Lozman's craft was not a vessel. Without an objective application of the §3 standard, one that relies in a predictable fashion only on those physical characteristics of a craft that are related to maritime transport and use, parties will have no *ex ante* notion whether a particular ship is a vessel. As a wide range of *amici* have cautioned us, numerous maritime industries rely heavily on clear and predictable legal rules for determining which ships are vessels.[6] The majority's distorted application of our

------

[6] For example, without knowing whether a particular ship is a §3 vessel, it is impossible for lenders to know how properly to characterize it as collateral for a financing agreement because they do not know what remedies they will have recourse to in the event of a default. Brief for National Marine Bankers Assn. as *Amicus Curiae* 14–15. Similarly, cities like Riviera Beach provide docking for crafts like Lozman's on the assumption that such crafts actually are "vessels," App. 13–21 (Riviera Beach's wet-slip agreement referring to Lozman's craft as a "vessel," "boat," or "houseboat"), that can be "remove[d]" upon short notice, *id.,* at 17 (requiring removal of the craft on three days' notice). The majority makes it impossible for these marinas to know whether the "houseboats" that fill their slips are actually vessels and what remedies they can exercise in the event of a dispute. See *id.,* at 15 ("In addition to any other remedies provided for in this Agreement,

settled law to the facts of this case frustrates these ends. Moreover, the majority's decision reaches well beyond relatively insignificant boats like Lozman's craft, *id.,* at 79 (listing purchase price of Lozman's craft as $17,000), because it specifically disapproves of lower court decisions dealing with much larger ships, see *ante,* at 10 (questioning *Holmes* v. *Atlantic Sounding Co.*, 437 F. 3d 441 (CA5 2006) (finding a 140-foot-long and 40-foot-wide dormitory barge with 50 beds to be a §3 vessel)).

## IV

It is not clear that Lozman's craft is a §3 vessel. It is clear, however, that we are not in a good position to make such a determination based on the limited record we possess. The appropriate response is to remand the case for further proceedings in light of the proper legal standard. See Brief for United States as *Amicus Curiae* 29–31. The Court resists this move and in its haste to christen Lozman's craft a nonvessel delivers an analysis that will confuse the lower courts and upset our longstanding admiralty precedent. I respectfully dissent.

---

the Marina, as a provider of necessities to this *vessel*, has a maritime lien on the *vessel* and may bring a civil action *in rem* under 46 United States Code 31342 in Federal Court, to arrest the *vessel* and enforce the lien . . . " (emphasis added)). Lozman's behavior over the years is emblematic of this problem. For example, in 2003, prior to his move to Riviera Beach, Lozman had his craft towed from one marina to another after a dispute arose with the first marina and he was threatened with eviction. App. 76–78. The possibility that a shipowner like Lozman can depart so easily over water and go beyond the reach of a provider of necessaries like the marina in response to a legal dispute is exactly the kind of problem that the Federal Maritime Lien Act, 46 U. S. C. §31342, was intended to address. See *Dampskibsselskabet Dannebrog* v. *Signal Oil & Gas Co. of Cal.*, 310 U. S. 268, 272–273 (1940).